[No. S004658. Apr. 26, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
THADDAEUS LOUIS TURNER, Defendant and Appellant.

**COUNSEL**

Dennis A. Fischer, under appointment by the Supreme Court, Douglas W. Otto and John M. Bishop for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Joel Carey and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGLESON, J.**—This is an automatic appeal from a judgment of death. Defendant Thaddaeus Louis Turner was found guilty of one count of first degree murder (Pen. Code, §§ 187, 189)[1] and one count of robbery (§ 211); the jury also found true a special circumstance that the murder was committed while defendant was engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(i)). We find no prejudicial error affecting either the guilt or penalty determinations. We will therefore affirm the judgment in full.

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

GUILT TRIAL

A. *Prosecution evidence.*

The victim, Roy Savage, was a middle-aged Black man who taught mathematics at Merced College. He also directed the college's Extended Opportunity Program for disadvantaged youth. After his divorce, and while his daughter was away at college, Savage lived alone.

On Monday, April 16, 1984, Savage's cousin Gregory Mayo arrived by prearrangement at Savage's home to do yard work. Approaching the rear of the house, as was his custom, Mayo noticed that Savage's car was not in the garage, the screen door was wide open, the screen had been cut, and there was blood on the back door itself. Looking through a window, Mayo saw something lying covered up on the floor inside. He entered, lifted the covering, and found Savage's dead body.

After arming himself with an axe handle and a tire iron, Mayo searched the house. He noticed numerous missing items, including two stereo sets, a tape cassette player, miniature speakers, wall statues, clothing, and the upstairs bedroom television set. Mayo summoned the police.

Responding detectives found numerous signs of a violent struggle. There were blood spatters on the front doorknob; spatters and bloody shoe prints were also found in the entry foyer. In the family room, there were spatters on the ceilings and walls, near the fireplace hearth, behind the couch, and on the drapes. A coffee table had been pushed aside, and its glass top was shattered and bloody. One of the liquor bottles on the bar was broken. Telephone cords in the family room and the upstairs bedroom had been cut, though the kitchen telephone had not been disabled. There was no blood on the cut cords. Mayo indicated that a stereo set was missing from the family room, and a speaker wire in that area was torn. A bloody television set remained in the room. There were also bloodstains on the wall of the staircase to the second floor, and in nearby closets.

From the family room, the pattern of blood continued to the back door and out onto an enclosed rear patio. There detectives found Savage's body, lying face down. It had been covered neatly by two towels and perhaps a sheet. The victim's head was resting on a pillow.

The door onto the patio was bent, as if by pushing, and blood patterns suggested the body had been dragged from the door to its final position. A cabinet in the patio had been pried open. The victim was fully clothed, and his clothing was undisturbed. He had sustained multiple stab wounds.

Mayo advised that two distinctive rings were missing from Savage's fingers, but these were later discovered under a rug less than a foot from the body. A gold chain Savage customarily wore was missing.

Mayo noticed that a fireplace tool was missing from the hearth in the family room; the implement was later found in one of the upstairs bedrooms. Mayo also located and turned over to police Savage's private telephone notebook. The notebook included the name "Thad" next to defendant's telephone number.

Pathologist Murdoch performed an autopsy which revealed that Savage had died of stab wounds between 24 and 48 hours earlier. Savage had been stabbed over 40 times in the abdomen, chest, neck, arms, leg, hands, and back. The wounds were most likely inflicted by a buck knife. One wound nearly severed Savage's thumb. The angles of the wounds differed, suggesting the victim was not stationary. Some of the wounds were defensive. Savage had bled to death from six penetrating wounds that punctured the heart and lungs. The liver and spleen had also been perforated by penetrating abdominal wounds. At least two of the wounds on the body were inflicted after death.

The autopsy further disclosed that Savage had eaten recently, and no alcohol or common drugs were found in a sample of his blood. There was no semen in Savage's rectum, though the anal opening was looser than normal. Seminal fluid was found at the tip of the victim's penis, indicating either recent sexual excitement or activity, or ejaculation at death.

Savage was last seen alive on Saturday, April 14, in defendant's company. Amir Falahi worked under Savage in the Extended Opportunity Program at Merced College, and was also a salesclerk at Gottschalk's Department Store in Merced. Shortly before the 6 p.m. closing time on April 14, Savage came into the store with defendant. Savage told Falahi defendant was doing some work for him; as compensation, Savage bought defendant a shirt and pants at a cost of $20 to $30.

Augusti Albritton testified that Savage and defendant came to Albritton's home on the evening of April 14. Savage returned a pickup truck borrowed from Albritton earlier in the week and retrieved his own Cadillac. Savage introduced defendant to Albritton during a 30- or 40-minute conversation.

Around 9 p.m. on Monday, April 16, two California Highway Patrol officers driving eastward on Ventura Boulevard in Fresno passed a Cadillac parked in the same direction. Defendant was standing in front of the car,

talking to the driver of another vehicle. The driver's door of the Cadillac was open and sticking out into traffic, creating a hazard.

As the officers made a U-turn to investigate, defendant got into the Cadillac and drove off. The officers made a second U-turn to follow. At the same time, they ran a radio license check and learned that the Cadillac was reported stolen. They continued to follow as defendant ran a traffic light. The officers turned on their red light, but defendant pulled over only after they also activated their siren.

Officer Spencer ordered defendant to alight from the Cadillac and lie on the ground. As this occurred, a further radio dispatch indicated that the Cadillac might have been involved in a Merced murder. Spencer handcuffed defendant and discovered a buck knife in a scabbard on defendant's belt.

The Cadillac was towed and later searched pursuant to a warrant. The television missing from Savage's bedroom was found in the car's trunk, and Savage's wallet was found in the glove compartment. Blood was discovered in the Cadillac's trunk and on its front seat. There was also blood on the stolen television, on a piece of paper found in the car, on defendant's buck knife, and on an athletic shoe worn by defendant at the time of his arrest. Samples from the television and the knife were consistent with the victim's blood, but inconsistent with defendant's.

Examination of defendant's person after his arrest disclosed only small scratches on his arms. Defendant had no self-defense wounds or injuries.

B. *Defense evidence.*

1. *Defendant's testimony.* Defendant took the stand in his own behalf. In response to questions from his own counsel, he acknowledged two prior felonies: a 1982 conviction for receiving stolen property, resulting in a prison sentence, and an earlier robbery conviction, for which defendant was committed to the California Youth Authority (CYA).

Defendant admitted stabbing and killing Savage. However, he claimed the incident was provoked by Savage's sudden, violent sexual advances.

Defendant testified as follows: After his release from prison in September 1983, he returned to Fresno to live with his mother and younger sister. At the time of his arrest for Savage's murder, he was working full-time as a laborer and carpenter's helper, earning $8 to $9 per hour.

According to defendant, he was waiting for a bus in Fresno one Friday evening after work. The bus stop was located at the corner of Blackstone

and Belmont, near a homosexual bar. Savage, a stranger, pulled up to the stop in an orange Volkswagen and offered defendant a ride. During the two-mile drive downtown, Savage said he was an engineer from Merced and learned that defendant did occasional yard maintenance work. Savage offered defendant $30 to do yard work for him on Saturday of the following weekend; defendant accepted. Savage gave defendant his telephone number and agreed to pick defendant up in Fresno, some 50 miles from Merced, if defendant had no transportation.

Telephone arrangements were subsequently made that someone would pick up defendant in Fresno early on the agreed Saturday morning. Savage himself arrived at the appointed time in a pickup truck and drove defendant back to Merced. Defendant was "pretty gone" on marijuana and phencyclidine (PCP).

After working a short time in Savage's yard, defendant took a break and smoked half a "Sherm" (a cigarette laced with PCP). Savage invited defendant in and gave him orange juice. Defendant observed there was more work than one man could do; Savage said not to worry because a relative was coming soon to help. Savage engaged defendant in conversation, learning of his prison and drug problems, and gave defendant a tour of the house.

Sometime before noon, Savage said he needed to take a television to Gottschalk's Department Store for repairs. After they dropped off the set, the two proceeded in the pickup to the Albritton home. They stayed for 15 to 30 minutes, then drove off in a Cadillac, leaving the pickup behind. Savage bought defendant lunch at a Burger King restaurant, and the two then returned to Savage's house. Savage said nothing more about yard work. Defendant played tapes on Savage's stereo. Savage offered defendant drinks, and defendant had three or four brandies.

At some point, Savage said he would buy defendant clothing in compensation for his work, but would not pay cash because defendant would use the money to buy drugs. They drove back to Gottschalk's, where Savage purchased defendant a shirt and a pair of pants. Back at Savage's home, Savage offered to cook defendant dinner; defendant declined. After talking on the kitchen telephone, Savage himself ate a steak meal, inviting defendant to listen to tapes in the meantime.

Savage then agreed to drive defendant home and promised he would be ready in a few minutes. While defendant remained seated in the family room, listening to tapes, Savage went upstairs. Savage returned wearing a T-shirt and blue shorts, placed a hand on defendant's shoulder and said, "Let's go to bed."

After determining he had heard Savage correctly, defendant pushed Savage back, but Savage began chasing defendant through the house. Finally, Savage hit defendant with some sort of wooden club. Defendant kicked Savage in the stomach and ran outside.

After lingering briefly beside the house, defendant walked up the street, smoking a PCP cigarette as he went. He bought a pack of cigarettes in a convenience store; as he emerged, Savage drove up in the Cadillac. Savage approached, apologized for his behavior, and agreed he would take defendant home after they retrieved defendant's coat.

However, once back at the house, Savage resumed his insistent sexual entreaties. Defendant repeatedly refused, offering instead to procure a girl for Savage or to furnish him "spanish fly." Defendant said he only wanted to go home, and he agreed not to tell anyone about Savage's advances. After extended argument, Savage left the room.

Returning, Savage came up behind defendant and grabbed him around the breast, arm, and neck. As the two men struggled, Savage pinned defendant on the couch and was choking him. Defendant pulled his buck knife from his back pocket and attempted to stab Savage in the shoulder. However, defendant missed his aim and the blade struck Savage's neck.

Defendant then pushed Savage off, dropping the knife in the process. Savage picked up a fireplace tool, swung it twice at defendant, and dropped it. As defendant grabbed the tool and turned to retrieve the knife, Savage approached from behind and accidentally fell on the blade, which deeply penetrated Savage's chest and caused severe bleeding.

Though defendant warned Savage to desist, and was now brandishing both the fireplace tool and the knife, Savage kept coming. As he advanced, Savage "was just talking about 'Baby I love you.'" Savage grabbed defendant again, and defendant stabbed Savage "a couple" of times. Again defendant dropped his knife.

Savage then ran to the patio, and defendant ran upstairs. Defendant threw the fireplace tool into one of the bedrooms, went into the master bedroom to get his coat, saw a television on a stand, and picked it up to use as a weapon in case Savage continued the pursuit. After a time, defendant went downstairs to retrieve his knife, still carrying the television. There he saw Savage lying face down on the patio floor. Defendant put down the television, checked Savage's pulse, took off Savage's watch and rings, checked the pulse again, found none, and surmised that Savage was dead.

Defendant jumped on the bar, poured himself a drink, and checked Savage's pulse once more. Finally convinced that Savage had died, defendant went to the bedroom of Savage's daughter, got a white blanket from her bed, and placed the blanket over the body as he had learned from watching television. Defendant then grabbed the television and Savage's car keys, ran outside, threw the television in the backseat of Savage's car, and drove back to Fresno.

According to defendant, he decided not to take Savage's watch and rings before leaving because he thought it was wrong to rob a dead body. He took the television in "panic" and appropriated the car only because he had no other transportation home. Defendant did not remember cutting the telephone cords. He also did not recall stabbing Savage 44 to 46 times, as the autopsy pathologist testified, though his knife was sharp, and he kept jabbing at Savage to keep him away. Defendant could not account for many of Savage's wounds.

Defendant denied using a sheet and pillows to cover Savage's body, said he did not move the body or wipe up the blood, and claimed the body was found in a different position than he had left it. After returning to Fresno, defendant explained, he parked Savage's car near his home and placed the television in the trunk. He did not intend to sell the television, since it did not belong to him. He did not realize Savage's wallet was in the glove compartment of the car.

Defendant said that the next evening, a Sunday, he moved Savage's car so its hubcaps would not be stolen. Defendant's father drove him to work on Monday morning, and defendant did not use Savage's car for that purpose. After work on Monday, defendant washed and vacuumed the Cadillac's interior. He then set out for Valley Medical Center, where he intended to leave the car in the parking lot. En route, he encountered a woman he knew and stopped to talk to her. The two agreed to meet for a drink. He had begun following her when the California Highway Patrol officers overtook and arrested him.

Defendant insisted he was not himself homosexual, and he claimed surprise and panic when confronted with Savage's advances. However, defendant acknowledged he was familiar with homosexuality from his time in prison, and that homosexuality did not particularly bother him. Defendant also indicated he was strong from lifting weights in prison.

*2. Other defense witnesses.* Jay Bradstone had worked at the Back Door, a bar on Blackstone near Belmont in Fresno. Bradstone testified the Back

Door had a reputation as a gay bar, though heterosexuals also patronized it. Bradstone had seen Savage in the bar on two or three occasions.

Merced Detective Strength testified that defendant's home was searched on Tuesday, April 17, 1984, for items listed by Mayo as missing from Savage's home. None was found. Strength also said he saw signs in Savage's home that someone had tried to wipe up the blood near the back door. Finally, Strength claimed Bradstone had mentioned that Savage was a frequent customer of the Back Door.

Phillip Hamm, a psychologist, testified in defendant's behalf. Hamm conducted two interviews with defendant, reviewed police reports and the preliminary hearing transcript, and administered standardized tests for personality traits and intelligence. Dr. Hamm concluded that defendant, though not normally psychotic, is passive, submissive, and below average in intelligence, judgment, and self-esteem. According to Dr. Hamm, defendant feels discomfort in unfamiliar social situations, quickly becomes disorganized under stress, and can easily be influenced by persons he perceives as having greater status and authority.

Dr. Hamm believed defendant felt grateful for Savage's kindness and became confused by Savage's sudden advances, which were calculated to take advantage of Savage's higher social status and defendant's passivity. These conditions, plus defendant's consumption of alcohol and PCP and his sense of isolation from familiar surroundings, diminished defendant's ability to cope with Savage's conduct. Defendant became dissociated during the homicide, experienced an actual or borderline psychotic state, and developed partial amnesia about what had occurred.

C. *Prosecution rebuttal.*

The People called forensic psychiatrist Stewart Coleman to testify that psychological tests and opinions are useless in the courtroom. Merced Detective Wright was recalled to state he examined a fireplace poker from Savage's house and found no blood. Wright also found no bloody sheet or blanket.

Recalled to the stand, Detective Strength testified that on April 16, 1984, after his arrest, defendant waived his *Miranda*[2] rights and agreed to talk to the police. Under interrogation, defendant denied knowing Savage. He also responded either that he could not remember, or could not answer, when

---

[2] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

asked whether he had ever been in Merced and where he had been the preceding Saturday night. After such questions had been repeated to similar effect several times, Strength saw that defendant was tired and terminated the interview.

## PENALTY TRIAL

### A. *Prosecution evidence.*

The only new prosecution evidence introduced at the penalty phase concerned the circumstances of the homicide. Pathologist Murdoch was recalled to testify in detail concerning the number, angles, depths, and force of the stab wounds in Savage's body. Dr. Murdoch emphasized that most of the wounds were deep and were inflicted with considerable force. According to Dr. Murdoch, the superficiality of certain cuts was caused by the fact that the knife had struck bone before penetrating deeply. Dr. Murdoch's testimony was illustrated by photographs which showed forcep-like devices inserted in the wounds to demonstrate their depths.

### B. *Defense evidence.*

Detective Strength testified that the remote control for the upstairs television was not taken. Ruth Turner, defendant's mother, testified that defendant had been a gentle and helpful child and youth, who made average grades in school and caused little trouble; he gave her a portion of each paycheck from his postprison job as a carpenter's helper. Ms. Turner noted that defendant's brother and three sisters had never been in trouble with the law; two sisters were currently attending college. A half-sister, an older cousin, and a neighbor confirmed that defendant had been quiet, gentle, and loving. A job developer, Louis Coleman, testified that defendant received good reports for punctuality and reliability in postprison job placements.

## GUILT ISSUES

### A. *Sufficiency of robbery evidence.*

██ Defendant argues there is insufficient evidence for a robbery conviction, for a first degree felony-murder conviction based on robbery,[3] and for a robbery-murder special circumstance, because there is no indication he formed an intent to steal from Savage *before* attacking and killing the

---

[3] As defendant notes, the jury was instructed on both the premeditation and felony-murder theories of first degree murder. The verdict does not indicate which theory or theories the jury accepted.

victim. ■ Defendant correctly observes that when the intent to steal arose only after force was used, the offense is theft, not robbery. (*People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613]; *People* v. *Green* (1980) 27 Cal.3d 1, 54 [164 Cal.Rptr. 1, 609 P.2d 468].) ■ Moreover, the elements of a robbery-murder special circumstance are not present if theft of the victim's property was merely "incidental" to a murder. (*Green, supra,* at pp. 60-62.)

Defendant points to his "uncontradicted" testimony that he killed in a panic response to homosexual advances, and only then decided to take property of the victim. Defendant suggests this is the only evidence of what occurred and implies it must therefore be accepted at face value. However, the jury was permitted to draw reasonable inferences from all the direct and circumstantial evidence, and could reject portions of defendant's story which seemed inherently implausible. Here, the record as a whole amply supports the verdicts.

In the first place, when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery. Defendant admitted killing Savage, and was in possession of the victim's car, wallet, and television when arrested two days after the homicide. Numerous other items were missing from Savage's home.

Additional persuasive evidence undermines defendant's version of events and supports the prosecution theory that defendant killed to further a robbery. By defendant's own account, he went armed with a buck knife to the fatal appointment with Savage, indicating a preexisting willingness to do harm to one who had befriended him. (See *People* v. *Alcala* (1984) 36 Cal.3d 604, 626-627 [205 Cal.Rptr. 775, 685 P.2d 1126].) The depth and number of the wounds, the presence of defensive and back wounds, the position of the body, the bloody disarray throughout the house, and the lack of injury to defendant, all indicate Savage was not a violent aggressor, as defendant claims, but was attempting to fend off and escape defendant's murderous attack. ■ ■ ■ Since property was taken, and nobody else was present, the jury could infer that defendant killed to prevent Savage from summoning help or later identifying defendant as the robber. (See *Alcala, supra,* 36 Cal.3d at p. 627; *People* v. *Haskett* (1982) 30 Cal.3d 841, 850 [180 Cal.Rptr. 640, 640 P.2d 776].)[4]

---

[4] "The fact that a slaying was unusually brutal, or involved multiple wounds, cannot *alone* support a determination of premeditation. Absent other evidence, a brutal manner of killing is as consistent with a sudden, random 'explosion' of violence as with calculated murder. [Citations.]" (*Alcala, supra,* 36 Cal.3d at p. 626, italics added.) However, brutality can be indicative of calculated violence *in context,* particularly where, as here, the brutality itself

Savage's telephone cords had been cut, further indicating someone intended to prevent contact with the outside world. Though defendant and the house were spattered with blood after the homicide, the cut cords themselves were bloodless. This suggests the killer cut the lines, and had developed a criminal purpose, before the fatal attack began.[5]

The signs of prying and forced entry, and the amount and nature of the property stolen, also buttress the inference that defendant had a preexisting intent to rob. A jury could deem it doubtful that after committing a sudden, unexpected, and gruesome homicide against a friendly acquaintance, one would remain and, for the first time, decide to force open doors and cabinets, and strip the house of valuable clothing and electronic equipment.

Moreover, the events described by defendant himself suggest that he was not surprised, confused, or frightened by Savage's sexual interest, but rather suspected and exploited that possibility. Defendant insisted he himself was not gay, but he also claimed he was neither naive nor particularly sensitive on the subject. He said his observations of homosexuality in prison did not particularly bother him, and he described the location of his first contact with Savage as a street corner near a gay bar. Considering the circumstances of their meeting, and Savage's eagerness to befriend a younger man from a distant city and a different background, the possibility that the relatively affluent Savage harbored exploitable sexual feelings would have been difficult to overlook. Finally, defendant—young, strong, and armed—had little to fear from his older, more sedentary victim.

The jury was not compelled to credit defense speculation, based only on defendant's implausible testimony, that sometime between Saturday evening and Monday morning, someone else entered Savage's home, cut the telephone cords, stole all the missing property except that found in defendant's possession, moved the body, and re-covered it.[6] Nor was the jury obliged to accept the defense psychiatric opinion—at odds with other evidence—that defendant killed in a semiconscious psychotic reaction to sudden stress.[7]

---

contradicts defendant's version of events, and other evidence also supports a theory of premeditation for criminal purposes.

[5] Defendant stresses that the kitchen telephone had not been disabled, even though he knew its location from overhearing Savage take a call in the kitchen. Of course, lapses of memory and planning are not unheard of in the course of violent crimes. And the jury was free to reject defendant's claim that he had overheard such a call.

[6] John Harris, a detective for the Merced County Sheriff's Department, testified for the defense that he was called to investigate a broken key in a lock at the Savage residence. However, the call occurred well *after* the police had completed their homicide investigation and after the locks had been changed following the investigation.

[7] Defendant points to independent evidence supporting his claim of an unplanned homicide to avoid sexual advances. He notes, for example, suggestions of Savage's gay life-style, signs

On analogous but less compelling facts, and with little discussion, we found "ample circumstantial evidence . . . that defendant had harbored an intent to steal from the outset . . . ." (*Ramkeesoon, supra,* 39 Cal.3d at p. 350.) Similarly here, we conclude there was strong and convincing evidence that defendant killed only after deciding to rob.

B. *Failure to instruct on theft as lesser included offense.*

■ Defendant argues the court erred prejudicially by failing to instruct sua sponte on theft as a lesser included offense of the robbery charge, and by failing to provide the jury with verdict forms permitting findings and convictions based on theft rather than robbery. Under the particular circumstances, we find no basis for reversal.

■ "The principles are well established. Theft is a lesser included offense of robbery, which [latter offense] includes the element of force or fear. [Citation.] ■ The court must instruct on a lesser included offense, even if not requested to do so, 'when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense.' [Citations.]" (*People* v. *Melton* (1988) 44 Cal.3d 713, 746 [244 Cal.Rptr. 867, 750 P.2d 741].)

■ Though less than convincing, defendant's testimony that he killed in response to Savage's advances, and only thereafter decided to take property, is substantial evidence that defendant did not steal by means of force or fear. (*Ibid.*; see also *Ramkeesoon, supra,* 39 Cal.3d at p. 351; *Green, supra,* 27 Cal.3d at p. 54.) The court therefore erred in failing to provide instructions and verdict forms which would permit convictions and findings based on theft rather than robbery.

Defendant claims we must therefore reverse the robbery-murder special circumstance, the robbery conviction, and the conviction of first degree murder insofar as based on a theory of felony murder. We disagree.

■ We have long held that erroneous failure to instruct on a lesser included offense is not prejudicial if "it is possible to determine that . . . the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. . . ."

of the victim's sexual excitement or activity just before death, and indications that defendant did not mind being seen with Savage shortly before the homicide. As we have observed, however, sexual implications in the case do not negate the prosecution's theory of an exploitative robbery-murder. Moreover, defendant need not have formed a robbery plan long in advance, nor planned the perfect crime, to be guilty as charged.

(*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913]; see also *People* v. *Wickersham* (1982) 32 Cal.3d 307, 335 [185 Cal.Rptr. 436, 650 P.2d 311].) ██ Here, the instructions actually given and the verdicts actually rendered persuade us beyond doubt that the jury considered the question of "after-formed intent" and rejected this "mere theft" theory on its merits. Accordingly, we conclude defendant suffered no prejudice.

At defense counsel's request, the jury *was* given special instructions highlighting the issue of "after-formed intent." After reciting the elements of robbery, including the element that the "taking be accomplished" by force or fear, the court admonished: "An act of force *accompanied by a theft* does *not* constitute robbery unless the act of force was *motivated by an intent to steal.* If the intent to steal does not arise until *after* force has been used against the victim, *no robbery has taken place.* [¶] If an individual kills for reasons unrelated to theft, for example, because of anger, fear, or revenge, and then decides to take advantage of the situation by stealing some object from the person of the decedent, *the taking will constitute at most a theft* and not a robbery." (Italics added.) Thus, the jury was told explicitly that it could not find a robbery if it accepted defendant's claim of "after-formed intent."

Next, the felony-murder instructions advised that the killing must have occurred "*as a result* of the commission of or attempt to commit the crime of robbery, and where there was in the mind of the perpetrator the *specific intent* to commit such crime . . . . The specific intent to commit robbery and the commission or attempt to commit such crime must be proved beyond a reasonable doubt." (Italics added.)

Finally, in defining the special circumstance of robbery-murder, the court told the jury it must find, among other things, "that the murder was committed *in order to carry out or advance the commission of the crime of robbery* or to *facilitate the escape therefrom* or to *avoid detection.* [¶] In other words, the special circumstance . . . is *not* established if the attempted robbery was *merely incidental* to the commission of the murder." (Italics added.)

These instructions made clear beyond doubt that defendant was not guilty of robbery, first degree felony murder, or the sole special circumstance charged, if his intent to steal arose only after the fatal assault. In finding for the prosecution on all robbery issues, the jury thus necessarily concluded that he decided to steal before assaulting Savage.

Defendant argues, however, that the court did not eliminate prejudice simply by defining the greater, charged offense with precision. By failing to

allow a *conviction* of the lesser, uncharged offense of theft, defendant urges, the court left the jury with an "unwarranted all-or-nothing choice" on robbery, murder, and death eligibility. Defendant relies heavily on a similar analysis in *Ramkeesoon, supra,* 39 Cal.3d at page 352. (See also *Wickersham, supra,* 32 Cal.3d at p. 324.) However, application of *Ramkeesoon*'s reasoning to the facts of this case would extend *Ramkeesoon* beyond its logical limits.

Ramkeesoon befriended one Mullins in a gay bar and accepted an invitation to stay the night in Mullins's apartment. Ramkeesoon was stopped by police while walking in Mullins's neighborhood early the next morning, carrying property belonging to Mullins. Mullins's body, riddled with stab wounds, was soon discovered in the apartment.

Ramkeesoon was charged with robbery and murder. At trial, he claimed he had killed Mullins in response to violent, unwanted sexual advances, and only then decided to take Mullins's watch, wallet, clock radio, and car. The jury received instructions generally defining robbery, and was also instructed on all degrees of homicide, including both premeditation and felony-murder theories of first degree murder. Ramkeesoon sought to exploit his claim of after-formed intent by proffering instructions allowing his conviction of theft as a lesser included offense of robbery. These instructions were erroneously refused. The jury returned general verdicts of robbery and first degree murder.

We found the error prejudicial, since we concluded the jury had never been expressly confronted with the disputed factual issue—the time at which the intent to steal arose—which was posed by the omitted theft instructions. The jury, we noted, was left with an " 'unwarranted all or nothing choice' [citation] on both the robbery and murder counts [fn. omitted] . . . since [Ramkeesoon] had admitted taking Mullins' property and robbery was the only available theft offense. The findings of robbery and murder did not necessarily resolve the factual question whether the intent to steal was formulated after [Ramkeesoon] had inflicted the fatal blows because the jury was never required to decide specifically whether [Ramkeesoon] had formed the intent to steal after the assault. [Fn. omitted.]" (39 Cal.3d at p. 352.)

Here, however, there appears no chance the jury was misled by an "all or nothing choice" on the robbery/theft issue. In contrast with *Ramkeesoon, supra,* 39 Cal.3d 346, the special instructions in this case did require the jury to confront and decide the issue of "after-formed intent." The jurors were told emphatically not to convict defendant of robbery or first degree felony murder, or to find the robbery-murder special circumstance true, if

they believed it reasonably possible that he killed for reasons unrelated to theft and stole only as an incidental afterthought. We cannot lightly assume the jury disobeyed such clear instructions on so many separate occasions. Moreover, even if the jurors were willing to convict defendant of robbery despite their belief he was guilty only of theft, we cannot imagine they would employ this reluctant verdict to support findings of *first degree murder* and *death eligibility* under a robbery-murder special circumstance.[8]

In this capital case, moreover, the jurors gave one last conclusive indication of their views. Knowing that a murder in the commission of robbery was the sole basis of defendant's eligibility for the death penalty, they nonetheless actually returned a death verdict. Such a normative result seems inconceivable from jurors who believed defendant guilty only of mere incidental theft, but nonetheless felt forced by an "all or nothing choice" to convict him of robbery.

Under these circumstances, we conclude the jury necessarily resolved the issue of after-formed intent adversely to defendant and found, on the ample strength of the evidence, that he killed Savage in the perpetration of a robbery. His claim of reversible error must therefore be rejected.

### C. *Circumstantial evidence instructions.*

The trial court gave a modified version of CALJIC No. 2.02, which advised the jury on how to evaluate circumstantial evidence introduced to prove the accused's "specific intent or mental state." The court also read CALJIC Nos. 8.83 and 8.83.1, which covered circumstantial evidence both generally, and with respect to intent or state of mind, in connection with the robbery-murder special-circumstance allegation. ■ However, defendant claims the court erred prejudicially by refusing also to give CALJIC No. 2.01, the basic circumstantial-evidence instruction.

We find no basis for reversal. Since defendant admitted killing Savage and taking at least some of his property, circumstantial evidence was entirely unnecessary on those issues. The only disputed matter sought to be proved by circumstantial evidence was the specific intent or state of mind with which defendant committed the charged acts. Accordingly, the instructions given covered the ground adequately.

---

[8] Under normal circumstances, we assume jurors follow clear instructions. The "all or nothing" argument addressed in *Ramkeesoon* and *Wickersham,* both *supra,* does suggest the contrary—that jurors *will* overlook missing elements of a charged offense when deprived of the option to return a lesser appropriate conviction actually supported by the evidence. If so, however, there seems no reason to believe, as defendant suggests, that such jurors will suddenly regain their technical probity and render strictly consistent verdicts on all other issues, whatever the consequences.

### D. *Flight instruction.*

■ Defendant claims that the giving of a flight instruction and the wording of the instruction given were erroneous on the facts of this case. We disagree on the merits and find no prejudice in any event.

The trial court gave the following modified version of CALJIC No. 2.52 (4th ed. 1979) (modification in italics): "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. *If there was such flight,* the weight to which such circumstance is entitled is a matter for the jury to determine."

An instruction in substantially this form *must* be given whenever the prosecution relies on evidence of flight to show consciousness of guilt. (§ 1127c.)[9] ■ A flight instruction is proper whenever evidence of the circumstances of defendant's departure from the crime scene or his usual environs, or of his escape from custody after arrest, logically permits an inference that his movement was motivated by guilty knowledge. (See, e.g., *People* v. *Cannady* (1972) 8 Cal.3d 379, 391 [105 Cal.Rptr. 129, 503 P.2d 585]; see also *Green, supra,* 27 Cal.3d at pp. 36-37.)[10]

■ Defendant urges that since the evidence shows only his return to his home town after the homicide, there is no basis for an inference of *guilty* flight. He claims the trial court erred by failing to make a preliminary ruling on this pure question of law, and by leaving its resolution to the jury under the modified language of the instruction. (See *People* v. *Hannon* (1977) 19 Cal.3d 588, 597-598 [138 Cal.Rptr. 885, 564 P.2d 1203].)

However, the trial court did effectively rule that there was substantial evidence of flight. The court explained there was a "departure" from the

[9] Section 1127c provides in pertinent part: "In any criminal proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. . . ."

[10] Guilty flight may be relevant not only where the identity of the perpetrator is at issue, but also where the accused admits some or all of the charged conduct, merely disputing its criminal implications. (See, e.g., *Cannady, supra,* 8 Cal.3d at p. 392; cf. *People* v. *Hedrington* (1985) 171 Cal.App.3d 517, 519-520 [217 Cal.Rptr. 754]; *People* v. *Clem* (1980) 104 Cal.App.3d 337, 344 [163 Cal.Rptr. 553].) Defendant admitted killing Savage, but the defense and prosecution differed sharply on the circumstances. The prosecution theorized that defendant intended to murder and rob the victim. Defendant claimed an unintentional killing in self-defense and also denied an intent to steal. Under these circumstances, the prosecution was entitled to use evidence of guilty flight to help prove defendant's criminal state of mind.

homicide scene, the meaning of which must be left to the jury. This was an implicit conclusion that the circumstances of the "departure" permitted an inference of guilty motive.

Moreover, in contrast with *Hannon, supra,* 19 Cal.3d 588, the modified instruction here did not by its terms "[leave] open the possibility that *no* evidence of [consciousness of guilt] may have been presented. [Fn. omitted.] . . . ." (19 Cal.3d at p. 597, italics in original.)[11] As the statute requires, the instruction merely allowed the jury to determine from the relevant evidence whether "flight" had been "proved."

Finally, evidence of guilty flight was substantial, if not compelling. *Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt (*Green, supra,* 27 Cal.3d at p. 37; *Clem, supra,* 104 Cal.App.3d at p. 344; *People* v. *Watson* (1977) 75 Cal.App.3d 384, 403 [142 Cal.Rptr. 134]), but the *circumstances* of departure from the crime scene may sometimes do so. (E.g., *Cannady, supra,* 8 Cal.3d at p. 391.) There were indications that defendant's departure from the Savage residence occurred with particular haste (a screen door left wide open, the victim's watch and rings left behind), and defendant himself testified he fled in panic, using the victim's car. The jury might well assume that these were normal responses to a grisly homicide, having no independent sinister significance, but that is not the only reasonable inference.

In any event, we discern no prejudice. Since defendant admitted participation in a bloody slaying, the jury was most likely to infer, as the instruction permitted, that his hasty departure was to be expected regardless of his consciousness of guilt. Moreover, the independent evidence that he committed murder in the course of a robbery was extremely strong. We see no reasonable probability that the flight instruction affected the verdicts. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

E. *Single-witness instruction.*

██ The trial court gave a modified version of CALJIC No. 2.27, which advised that the credible testimony of a single witness is sufficient "proof" of any "fact," but cautioned that before "finding any fact to be proved" by the uncorroborated testimony of a single witness, the jury should "carefully

---

[11] The consciousness-of-guilt issue in *Hannon* concerned disputed evidence that the accused had attempted to suppress unfavorable evidence. Under the *Hannon* trial court's instruction, *"evidence, if there was any in this case,* that the defense attempted to suppress any evidence against the defendant . . . may be considered by you, if you find it exists here as a circumstance tending to show a consciousness of guilt. . . ." (19 Cal.3d at p. 597, fn. 3, italics added in part.)

review" the testimony on which the "proof of such fact" depends. Defendant argues the court erred by omitting a phrase which would have limited the cautionary admonition to the finding of any fact "required to be established by the prosecution."[12] He urges that as given, the instruction unfairly singled out his own testimony for suspicion and wrongly implied he had the burden of "proof" to negate malice.

We recognize that the precision of the standard "single witness" instruction could be marginally improved. However, we see no error or prejudice in the form of instruction given here.

In the first place, we could hardly fault the trial court for instructing as it did, since it followed exactly the form we prescribed in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]. There we discussed the instruction as a necessary aid to *defendants* implicated only by the uncorroborated testimony of a single witness, but we did not limit our holding to prosecution witnesses. We declared that a cautionary single-witness instruction, phrased exactly as stated in this trial, "should be given in *every* criminal case in which no [independent] evidence [corroborating a single witness] is required. . . ." (P. 885, italics added.)

CALJIC later developed its own slightly altered form which optionally limited the instruction to "any fact required to be established by the prosecution." (See CALJIC No. 2.27.) However, the Use Note for the CALJIC instruction advises that the limitation to prosecutorial evidence should be deleted "as to testimony by a single witness of defenses as to which the defendant has the burden of proof." (CALJIC (5th ed. 1988) at p. 55.)

Defendant argues, in essence, that the uncorroborated testimony of a *defense* witness should *never* be subject to the cautionary instruction, since the *state* must prove every element of a charged offense, and the defense has no burden of "proof" of "facts" to which the admonition might apply. (E.g., *People* v. *Cornett* (1948) 33 Cal.2d 33, 42-43 [198 P.2d 877]; *People* v. *Hyde* (1985) 166 Cal.App.3d 463, 475 [212 Cal.Rptr. 440]; see *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375, 90 S.Ct. 1068].)[13]

---

[12] The single-witness instruction, as given by the trial court, was as follows (the phrase defendant urges was erroneously omitted is indicated by brackets): "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact [required to be established by the prosecution] to be proven solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends."

[13] Section 189.5, subdivision (a) (formerly § 1105, subd. (a)), provides that "[u]pon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only

However, an accused is not entitled to a false and unique aura of veracity when his uncorroborated testimony is offered as *evidence raising a reasonable doubt* that he is guilty as charged. (See *People* v. *Allison* (1989) 48 Cal.3d 879, 896, fn. 7 [258 Cal.Rptr. 208, 771 P.2d 1294] [false-in-part instruction].) When the accused offers his uncorroborated testimony for this purpose, the jury should weigh such evidence with the same caution it accords similarly uncorroborated testimony by a prosecution witness.

Defendant claims the instruction is nonetheless confusing as here given, since it erroneously *suggests* the defense, like the prosecution, has the burden of proving facts. On reflection, we agree that the instruction's wording could be altered to have a more neutral effect as between prosecution and defense, while still satisfying the concerns we identified in *Rincon-Pineda, supra,* 14 Cal.3d 864. We encourage further effort toward the development of an improved instruction.[14]

However, we cannot conclude that the instant jury was misled. Defendant's testimony conceded he had committed homicide and had taken property. He sought only to disclaim the independent felony (robbery) or the malice necessary for murder. On the other hand, the jury was instructed at length that the People must prove all elements of each charged offense beyond a reasonable doubt, including defendant's specific mental state where relevant. The jury was expressly told that it must acquit defendant of any charge, and find the special circumstance untrue, if it had a reasonable doubt that all elements of the offense or special circumstance had been established. We cannot imagine that the generalized reference to "proof" of "facts" in CALJIC No. 2.27 would be construed by a reasonable jury to undermine these much-stressed principles.

Finally, defendant asserts that since his was the only uncorroborated testimony in the case, the instruction unfairly implied that his testimony alone should not be trusted. Again, however, defendant advances no reason why an accused's uncorroborated testimony is entitled to special credibility. On the contrary, the jury must understand that *any* uncorroborated information offered by a single witness, defense or prosecution, is to be viewed with caution.

---

amounts to manslaughter, or that the defendant [*sic*] was justifiable or excusable." However, given the reasonable doubt standard, this statutory language has long been construed to refer only to a defense burden of *producing evidence* sufficient to raise a reasonable doubt, rather than a burden of proof or persuasion. (See text authorities, *ante.*)

[14] For example, and solely by way of illustration, such a refined instruction might provide that "you are free to give the uncorroborated testimony of a single witness whatever weight you think it deserves. However, before crediting the uncorroborated testimony of a single witness, you should review such testimony carefully."

Finally, even if we were to deem the instruction erroneous or misleading under the circumstances of this case, we could find no prejudice in light of the very strong prosecution evidence and the inherent improbability of much of defendant's testimony. We therefore find no basis for reversal.

### F. False-in-part instruction.

The trial court gave a slightly modified version of the standard false-in-part instruction. (CALJIC, former No. 2.21 (4th ed. 1979), see now CALJIC Nos. 2.21.1, 2.21.2 (5th ed. 1988).) The instruction warned that "[a] witness willfully false in one material part of his testimony is to be distrusted in others." It authorized the jury to "reject the whole testimony" of such a witness "unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars." On the other hand, the instruction cautioned that discrepancies between witnesses, or within a witness's own testimony, do not necessarily indicate general untrustworthiness, since innocent forgetfulness is common, and two persons may see the same events differently.[15]

■ Defendant claims the instruction improperly singled out his testimony alone for suspicion, and thus lessened the prosecution's burden, because the circumstantial evidence presented by the prosecution witnesses was not disputed. The instruction was also invalid here, defendant urges, because there was no evidence that he told any material willful falsehood on the stand. We find no error or prejudice.

False-in-part instructions have been criticized and disapproved elsewhere on grounds that they are superfluous and invite the jury to conclude the court believes one or more witnesses have lied. (See, e.g., *Kinard* v. *United States* (D.C.App. 1980) 416 A.2d 1232; *State* v. *Harris* (1970) 106 R.I. 643 [262 A.2d 374, 377]; *Knihal* v. *State* (1949) 150 Neb. 771 [36 N.W.2d 109, 112-114]; *Rowland* v. *St. Mary's Bank* (1944) 93 N.H. 246 [40 A.2d 741,

---

[15] The instruction given was as follows (brackets indicate deviation from standard language of CALJIC, former No. 2.21): "A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars. [¶] However, discrepancies in a witness' testimony or between his testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience; [and innocent misrecollection is a common experience;] and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance."

This instruction has now been divided in two. CALJIC No. 2.21.1 (5th ed. 1988) substantially restates the second paragraph of CALJIC, former No. 2.21, and CALJIC No. 2.21.2 (5th ed. 1988) substantially restates the first paragraph of CALJIC, former No. 2.21.

742].) However, we recently rejected challenges to the California instruction, noting it "has been repeatedly approved [in this state] as a correct statement of the law, appropriately given where there is an evidentiary basis to support it. [Citations.]" (*Allison, supra,* 48 Cal.3d at p. 895.)

Citing dictum in *People v. Lescallett* (1981) 123 Cal.App.3d 487, 493 [176 Cal.Rptr. 687], defendant argues the instruction should not be given where it appears principally directed at the exculpatory testimony of the accused. Such a danger exists here, he asserts, because the circumstantial evidence presented by the prosecution witnesses was largely uncontroverted.

We disposed of an identical argument in *Allison, supra.* We noted that the instruction is neutrally phrased and does not focus attention on a particular witness. (48 Cal.3d at p. 895.) Moreover, we emphasized, in this context as in others, " 'a defendant who elects to testify is not entitled to a false aura of veracity. [Citations.]' " (*Id.,* at p. 896, fn. 7, quoting *People v. Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1].) Applying neutral standards of credibility to defense witnesses does not improperly "lessen the prosecution's burden."

Defendant suggests the false-in-part instruction is proper, if ever, only when there are discrepancies between opposing witnesses whose credibility is equally subject to attack. But an inference of willful falsehood can also arise from inconsistencies within the testimony of a single witness (as the instruction itself explains), or when his efforts to explain away undisputed circumstances are inherently implausible.

There were many such instances of implausibility in defendant's testimony. Among other things, he denied cutting telephone cords which were found severed; he denied taking property which was found missing; he was arrested in possession of a television he insisted he picked up only for self-defense; and his claims of defensive "poking" with his knife were inconsistent with the number, depths, and locations of the victim's wounds. Thus, there was ample evidence upon which to base the false-in-part instruction.

In any event, we conclude defendant suffered no prejudice by any applicable standard. Given the strong circumstantial evidence of robbery-murder, and the inherent implausibility of much of defendant's version of events, we cannot conclude the instruction caused any increased distrust of his testimony. There is no substantial chance the outcome was affected. No basis for reversal appears.

G. *Correction of verdict.*

On the morning of Wednesday, November 21, 1984, the jury returned verdicts on the guilt and special circumstance issues. The forms signed by

the foreman indicated a verdict of guilty of first degree murder (count I) and a true finding on the robbery-murder special circumstance. After the verdicts were announced and the jury was polled, the jurors were admonished, told to return for commencement of the penalty trial the following Tuesday, and released. Neither counsel objected to the form or regularity of the verdicts while the jurors remained present.

On the afternoon of November 21, the jurors having departed, court and counsel realized that the jury had signed and returned no verdict, one way or the other, on count II, the robbery charge. Over defense counsel's objection, the court took the position that it had not *discharged* the jurors, and thus still had jurisdiction to recall them to correct the verdict. In the court's view, it could direct the jurors either to record any decision they had already reached on the robbery count, or to resume deliberations on that issue.

The nine available jurors and the two alternates were recalled to the courtroom the same afternoon; the remaining three jurors could not be found. Juror Obara, the foreman, insisted in open court that the jury had indeed reached a decision on the robbery count. However, Obara recounted, no verdict form had been signed because the jurors had misinterpreted the court's response to an earlier question as meaning that if they found the murder and special circumstance charges true, they did not have to return a verdict form on the robbery charge. Juror Patten agreed with Obara's account, and no juror present demurred.

Nonetheless, the court decided it was not possible to "proceed" further without all jurors present. The court indicated the jury would therefore be asked to "return next Tuesday morning on that matter [i.e., the robbery count] as well as the others [i.e., the penalty phase]." Those present were again admonished not to discuss the case further or to form any opinion or conclusion "that hasn't already been reached by you, in your deliberations. [¶] In other words, please go no further than your state of mind as of this moment. Whatever that is. . . ."

The full jury returned as ordered on Tuesday, November 27. The court directed the jury to "resume its deliberations" on the robbery count, and the jury retired at 10:12 a.m. Eleven minutes later, the jury returned a verdict of guilty on count II.

■ Defendant urges that this procedure was erroneous and void because the jurors, once discharged from their guilt phase responsibilities and released from the court's custody and control, could not be recalled to

clarify or complete their verdict. However, we recently held the contrary under substantially similar circumstances.

In *People* v. *Bonillas* (1989) 48 Cal.3d 757 [257 Cal.Rptr. 895, 771 P.2d 844], the jury in a capital case returned guilty verdicts on charges of murder and burglary, and also found true a burglary-murder special circumstance. However, because a necessary verdict form was mistakenly not furnished, the jury failed to specify the degree of the murder as the law requires. (See § 1157.) The defect was not immediately noticed; the jury was admonished, told to return for the penalty trial, and released.

The next day, a Friday, defense counsel brought the problem to the court's attention. Over counsel's objection, the court ordered the jury to reassemble the following Monday, in advance of the penalty trial, to determine the degree of the murder. Within minutes, the jury returned a finding that the murder was in the first degree.

In an extended discussion, we upheld this procedure. We explained that jurors in a capital case are neither "discharged," nor beyond the court's control, once they have completed guilt phase deliberations. "Where, as here, further proceedings are to take place, the jury has not been discharged, the jurors have been specifically instructed that they are still jurors in the case, they have been admonished not to discuss the case with anyone nor to permit anyone to discuss the case with them, and they have been directed not to read anything about the case, the jurors have not thrown off their character as jurors nor entered the outside world freed of the admonitions and obligations shielding their thought processes from outside influences. Clearly, the jury here remained within the court's control [citations], their verdict was incomplete, and the court was authorized to reconvene the jury to complete its verdict." (48 Cal.3d at p. 773.)

Similarly, the jury in this case rendered an incomplete guilt verdict, since it failed to find on all charged offenses. Nonetheless, before they were released pending the penalty trial, all the jurors were admonished to avoid exposure to all publicity about the case; to refrain from reading or listening to anything about the case; not to discuss "this matter" with anyone or allow anyone to discuss it with them; and "not to discuss the matter among yourselves or with anyone else." Under these circumstances, as in *Bonillas, supra,* the panelists had not lost their status as jurors nor entered the world free of court-imposed restrictions on outside influences. The court was therefore authorized to recall them to complete their verdict.[16]

---

[16] As defendant notes, the court's admonition at several points could be construed as applying only to the issue of penalty. For example, the court observed that "[s]o far as your state of mind is concerned, while you've reached a verdict with regard to what we refer to as the guilt

Defendant urges that if the jurors could be reconvened for this purpose, at least they should have been instructed clearly to begin their robbery deliberations "anew." He asserts that the nine jurors who heard the ambiguous colloquy between the court and Juror Obara on the afternoon of November 21 could reasonably have inferred the court's "tacit" acceptance of Obara's claim that a robbery verdict had already been reached, and that no further deliberations were necessary. Hence, he implies, the subsequent jury proceedings were fatally infected with improper judicial coercion, as evidenced by the speed of the final robbery verdict.

We see no impropriety. In the first place, when all the jurors returned on November 27, they *were* clearly told to "resume *deliberations.*" (Italics added.) Second, the colloquy of November 21 had no coercive import. Indeed, though Juror Obara argued that the jury had merely failed to sign the verdict form, he acknowledged in open court he was "sure that won't be accepted . . . ." The court promptly responded, "That's right." After hearing further from Obara, the court again stated, "Well, sir, I'm sorry. Without the presence of all of the members of the jury, it's just not possible for us to proceed." Nothing in this exchange could reasonably be construed as the court's agreement that no further deliberations were necessary.

Nor was it error for the court to suggest, as it did on both November 21 and 27, that the jury should take up robbery deliberations *wherever they had left off.* The 12 jurors who reconvened on November 27 were the same panelists who had deliberated on November 20 and 21. Thus, it was not necessary that deliberations begin anew in order to afford defendant his right to "deliberations which are the common experience" of each of the jurors. (Compare *People* v. *Collins* (1976) 17 Cal.3d 687, 692-693 [131 Cal.Rptr. 782, 552 P.2d 742].)

Finally, defendant argues that if the robbery conviction is invalid on the grounds asserted, the robbery-murder special circumstance must also fall because the former is a "necessary condition" of the latter. (*Green, supra,* 27 Cal.3d at p. 59.) Our finding that the robbery conviction was proper makes it unnecessary to address the special circumstance issue.

---

phase of this trial, the penalty phase remains before you." At other points, the court cautioned that "it is very important that you do not discuss . . . the *penalty phase* with each other at this time" and "that you not form or express an opinion or a conclusion upon the *penalty phase* of this matter until it's finally submitted to you." (Italics added.) As noted, however, the court also clearly admonished against any unauthorized discussion or information about "this case" or "this matter." We cannot imagine the jurors took any qualified phrases in the court's warning as an invitation to discuss *guilt* issues freely with their families, friends, and fellow jurors.

## H. *Admission of prior convictions.*

Defendant urges that his prior convictions should not have been admitted for purposes of impeachment, since the trial court failed to exercise discretion to admit or exclude them after weighing their probative value against their potential for unfair prejudice. (See *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) Defendant acknowledges that his trial counsel raised no objection to admission of the prior convictions and did not request that the court exercise its exclusionary discretion. Indeed, defense counsel himself elicited the existence and nature of the prior convictions during his direct examination of defendant. Defendant argues that his counsel thereby rendered ineffective assistance.

Under the particular circumstances, however, we need not brand counsel incompetent in order to address the merits of defendant's claim on direct appeal. Though evidentiary challenges are usually waived unless timely raised in the trial court, this is not so when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change. (E.g., *People* v. *Ogunmola* (1985) 39 Cal.3d 120, 123, fn. 4 [215 Cal.Rptr. 855, 701 P.2d 1173]; *In re Gladys R.* (1970) 1 Cal.3d 855, 861 [83 Cal.Rptr. 671, 464 P.2d 127]; *People* v. *De Santiago* (1969) 71 Cal.2d 18, 22-23 [76 Cal.Rptr. 809, 453 P.2d 353]; *People* v. *Kitchens* (1956) 46 Cal.2d 260, 263 [294 P.2d 17].) Such is the case here.

In 1982, Proposition 8 added article I, section 28, subdivision (f) (section 28(f)), to the California Constitution, providing that "[a]ny prior felony conviction of any person in any criminal proceeding, . . . shall subsequently be used *without limitation* for purposes of impeachment . . . ." (Italics added.) Section 28(f) governed defendant's trial, since the charged crimes occurred after June 9, 1982, the effective date of Proposition 8. (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149].)

It was widely assumed that the "without limitation" language of section 28(f) eliminated *all* restrictions on the admissibility of prior felony convictions for purposes of impeachment. We so paraphrased section 28(f) in our decision upholding the validity of Proposition 8. (*Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 243 [186 Cal.Rptr. 30, 651 P.2d 274] [§ 28(f) permits "unlimited use" of prior felonies for impeachment].) Moreover, at the time of defendant's November 1984 trial, all but one originally published Court

of Appeal decision addressing the issue had so concluded.[17] Under these circumstances, a reasonable and competent criminal trial attorney could well have surmised that any effort to limit or exclude "impeachment" priors in a case governed by Proposition 8 would be futile.

However, in March 1985, after defendant's trial, a majority of this court held in *Castro* that Proposition 8 did not eliminate the trial court's power and duty under Evidence Code section 352 to weigh the probative value of prior convictions offered for impeachment against their potential for unfair prejudice. *Castro* further held that only crimes involving "moral turpitude" are admissible for purposes of impeachment. (38 Cal.3d at pp. 306-316 [plur. opn. of Kaus, J.], 322 [conc. & dis. opn. of Grodin, J.], 323-332 [conc. & dis. opn. of Bird, C. J.].)

Our *Castro* decision thus rejected the overwhelming weight of appellate authority and consciously declined to accept the apparent plain meaning of the constitutional language. (See plur. opn. of Kaus, J., 38 Cal.3d at p. 310 ["subdivision (f) seems clear and absolute . . .—'any' means 'any' and 'without limitation' means 'without limitation,' . . ."]; conc. & dis. opn. of Grodin, J., 38 Cal.3d at p. 319 ["subdivision (f) on its face does not suffer from any lack of clarity or directness"]; conc. & dis. opn. of Lucas, J., 38 Cal.3d at pp. 322-323 [concurring in Grodin, J.'s analysis of § 28(f)].) Defendant's counsel cannot be saddled with the burden of anticipating such an abrupt change in the law.[18] We therefore address defendant's *Castro* claim.

---

[17] See *People v. Rangel* (Cal.App.); *People v. Aldana* (Cal.App.); *People v. Harrison* (Cal.App.); *People v. Castro* (Cal.App.); *People v. Sweeney* (Cal.App.); *People v. Jaurez* (Cal.App.); but see *People v. Miles* (Cal.App.).*

---

*Reporter's Note: *People v. Rangel* (4 Crim. 14993), opinion deleted upon direction of Supreme Court by order dated June 14, 1984; *People v. Aldana* (A020052), opinion deleted upon direction of Supreme Court by order dated April 19, 1984; *People v. Harrison* (3 Crim. 12656), review granted April 19, 1984, on July 18, 1985, cause transferred to Court of Appeal, Third District, with directions, subsequent opinion filed on March 4, 1986, but not certified for publication; *People v. Castro*, for subsequent opinion see 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]; *People v. Sweeney* (4 Crim. 14805), review granted March 22, 1984, cause transferred to Court of Appeal, Fourth District, Division Two, with directions, subsequent opinion filed September 11, 1985, but not certified for publication; *People v. Juarez* (A021583), review granted February 23, 1984, on May 16, 1985, cause transferred to Court of Appeal, First District, Division Five, with directions, subsequent opinion filed June 10, 1985, but not certified for publication; *People v. Miles* (2 Crim. 43546), review granted May 24, 1984, on July 25, 1985, cause transferred to Court of Appeal, Second District, Division Four, with directions, for subsequent opinion see 172 Cal.App.3d 474 [218 Cal.Rptr. 378].

[18] The People claim defense counsel waived any reliance on *Castro* by himself asking defendant to disclose the fact and nature of the prior convictions. Given the apparent futility of an effort to exclude the prior convictions, however, prudent counsel would be well advised to minimize their "sting" by eliciting them himself. Such defensive acts do not waive an objec-

■ We note at the outset that the two prior convictions were neither admissible nor inadmissible as a matter of law. (See *People v. Collins, supra,* 42 Cal.3d 378, 389, 390, fn. 11.) Both robbery and receiving stolen property necessarily involve moral turpitude. (*Id.,* at p. 395; *People v. Waldecker* (1987) 195 Cal.App.3d 1152, 1156 [241 Cal.Rptr. 650]; *People v. Rodriguez* (1986) 177 Cal.App.3d 174, 178-179 [222 Cal.Rptr. 809].) Moreover, under the facts of this case, the broad authority afforded by *Castro* would have permitted the trial court either to admit or to exclude both prior convictions.

■ Nonetheless, we find no need for a *"Collins* remand" to enable the trial court to exercise its *Castro* discretion nunc pro tunc. On the facts of this case, we do not consider it reasonably probable that admission of the prior convictions altered the outcome. Hence, the absence of a trial court ruling on the matter must be deemed harmless. (*Collins, supra,* 42 Cal.3d at pp. 390-391.)

We recognize some potential for prejudice in both prior convictions. Both were relatively recent and, like the robbery charge at issue here, both involved crimes of dishonesty against property. The prior robbery was an identical charge and implied that defendant was predisposed to steal by force or fear. Revelation of this prior conviction could detract from defendant's efforts to raise a reasonable doubt whether the killing of Savage was related to a robbery.

---

tion on appeal. (See *Williamson v. Pacific Greyhound Lines* (1949) 93 Cal.App.2d 484, 487 [209 P.2d 146].)

The People speculate that there were other plausible tactical reasons for the defense decision to reveal the priors. We can discern none. In fact, the reasons suggested by the People implicitly assume that counsel acted defensively in light of the apparent futility of a motion to exclude.

Nonetheless, the People also urge that *Castro's* result was not so unforeseeable as to excuse objection. They stress that such objections were obviously made in the several pre-*Castro* cases which led to appellate opinions. These challenges had consistently been rebuffed, however, and counsel here was not obliged "to anticipate that [we would] later interpret the controlling sections in a manner contrary to the apparently prevalent contemporaneous interpretation." (*Gladys R., supra,* 1 Cal.3d at p. 861.)

For similar reasons, it is not dispositive that, at the time of defendant's guilt trial, we had caused depublication of every published opinion addressing the "prior impeachment" language of Proposition 8, regardless of result, and had granted hearing in *Castro* and several other such cases. We have long cautioned that such actions on our part have no precedential value and may not be construed as a signal of our ultimate intentions.

Finally, we see no conflict between our decision here and our holding in *People v. Collins* (1986) 42 Cal.3d 378 [228 Cal.Rptr. 899, 722 P.2d 173]. There we implied that the "issue" of appellate relief under *Castro* is presented only by those pre-*Castro* trials in which *motions to exclude* were erroneously denied without any exercise of trial court discretion. (P. 389.) However, *Collins* did not present, and our opinion therein did not discuss, the question whether *Castro* so changed the law as to excuse prior objection.

However, the valid evidence, both direct and circumstantial, that defendant was guilty of robbery and murder, was compelling. Defendant was unable to conform crucial portions of his exculpatory testimony to the undisputed physical facts. His claims about his motives for the homicide were undermined by his admissions that he was familiar with homosexuality and did not object. (See *ante*, at pp. 688-689.) Under these circumstances, we think it highly unlikely that the prior convictions tipped the balance. Hence, there is no basis for reversal, or for further proceedings on the *Castro* issue.

### I. *Videotape, photos, and autopsy testimony.*

Defendant contends he was prejudiced on both guilt and penalty by improper admission at the guilt trial of a videotape depicting the crime scene and the victim's body as initially encountered by the police. He also objects to guilt phase testimony by the autopsy physician, Dr. Murdoch, and related autopsy photos, indicating the number, location, and severity of wounds on the victim's body. Defendant claims these materials were gruesome, inflammatory, irrelevant, and cumulative.

Several responses are appropriate. First, defendant waived these issues on direct appeal by failing to object at trial to introduction of the challenged evidence. Second, defendant may not claim on appeal that counsel's failure to object constituted ineffective assistance. The appellate record does not affirmatively disclose that counsel acted from ignorance or mistake, and there are plausible reasons why competent counsel would not oppose admission of the tape, testimony, and photos. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581-582 [189 Cal.Rptr. 855, 659 P.2d 1144].)[19]

In any event, the challenged evidence was highly pertinent, since the two divergent theories of how the homicide occurred depended for support on details of physical and circumstantial evidence, including a clear understanding of the clues provided by the condition of the victim's body and the crime scene itself. The prosecution was not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory of murder for robbery. Hence, the tape, testimony, and photos were

---

[19] Indeed, counsel used the tape in cross-examination of an investigating officer to stress that though the victim's body and the surrounding area were "saturated" with blood, a pillow under the victim's head did not contain blood. This advanced the defense theory that after the homicide, someone other than defendant had entered, stolen property, and placed the pillow. Similarly, competent counsel might conclude that the photos and autopsy testimony, by indicating an "explosion" of violence, supported defendant's theory that he reacted in panic and confusion to a sexual attack.

neither irrelevant nor cumulative. (See, e.g., *Melton, supra,* 44 Cal.3d at pp. 740-742; compare, e.g., *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1137 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Even if the evidence should have been excluded as irrelevant or cumulative, no reversible prejudice ensued. Our independent review of the tape, photos, and autopsy testimony persuades us that they were not unduly gruesome or inflammatory. (*Anderson, supra.*)

## PENALTY ISSUES

### A. *Section 190.3 notice of aggravating evidence.*

Defendant contends that certain matters urged by the prosecution in aggravation of penalty should have been excluded from consideration for lack of timely notice. He invokes the statutory requirement that "[e]xcept for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty," aggravating evidence may not be presented by the prosecution "unless notice of the evidence to be introduced has been given to the defendant within a reasonable time as determined by the court, prior to trial. . . ." (§ 190.3.)[20] To the extent the claim is cognizable on appeal, we see no reversible prejudice.

On Wednesday, November 21, 1984, the trial court received the jury's initial, incomplete guilt verdict and set the following Tuesday, November 27, for commencement of the penalty phase. Defense counsel also indicated to the court on November 21 that he had received no notice of the People's penalty phase evidence. In response, the prosecutor advised for the first time that the People would assert defendant's earlier crimes as aggravating evidence.[21] The trial court subsequently ruled that, because of the late notice, the prosecutor could present no new evidence of these crimes, but would be confined to the information already elicited from defendant himself at the guilt phase.

---

[20] As pertinent here, section 190.3 provides: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation."

[21] Among the "aggravating factors" listed in section 190.3 are "[t]he presence or absence of criminal activity by the defendant [other than the current charges] which [activity] involved the use or attempted use of force or violence or the express or implied threat to use force or violence" (factor (b)), and "[t]he presence or absence of any prior felony conviction" (factor (c)). The prior robbery conviction was pertinent under both factors (b) and (c) (see *Melton, supra,* 44 Cal.3d at p. 764); the prior receiving conviction was pertinent under factor (c).

On the morning of November 27, the prosecutor first advised in open court that he intended to recall Dr. Murdoch, and to introduce photos not offered or admitted at the guilt trial, to demonstrate the great force with which the knife blows were delivered.[22] The prosecutor disclosed that the new photos would show forceps inserted in the wounds to indicate their depth.

Defense counsel objected *in limine,* but only on grounds that (1) the evidence was unduly prejudicial under Evidence Code section 352 and (2) Dr. Murdoch had already been examined at length. The *in limine* objection was overruled. At that moment, the jury reported it had a belated verdict on the robbery count. The jury was recalled, its verdict was received and recorded (*ante,* at pp. 699-700), and the penalty phase began immediately. Aided by the autopsy photos, Dr. Murdoch thereupon gave the testimony predicted by the prosecutor.

As ordered, the prosecutor introduced no new prior-crimes evidence. However, in his closing argument, he urged the guilt phase evidence of defendant's prior convictions as aggravating.

At the outset, we doubt defendant has preserved the notice issue for appeal. As to the Murdoch testimony and photos, he never raised *any* specific *notice* objection in the trial court. Moreover, he did not *timely* object in either case. Because *in limine* rulings on evidence are subject to reconsideration upon full information at trial, an evidentiary objection must be renewed " 'at such time as the evidence is actually offered' " (*People* v. *Boyer* (1989) 48 Cal.3d 247, 270, fn. 13 [256 Cal.Rptr. 96, 768 P.2d 610]; *People* v. *Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 [251 Cal.Rptr. 278, 760 P.2d 475]), or when opposing counsel makes improper argumentative use thereof.[23]

Nonetheless, to forestall claims of ineffective assistance, we briefly address the merits. We find no denial of any substantial right protected by the notice provision of section 190.3. Defendant was notified on November 21, some six days before the penalty trial began, that the People intended to invoke the prior crimes revealed by defendant in his guilt phase testimony.[24]

---

[22] This evidence was relevant in aggravation of penalty under factor (a) of section 190.3, as concerning "[t]he circumstances of the crime[s] of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . ."

[23] Failure to object to improper argument does not waive the issue on appeal if an admonition to the jury would not have cured the harm. However, any prejudice from improper reference by the prosecutor to defendant's prior crimes could have been cured by prompt admonition.

[24] The prosecutor's notification was oral, but the statute does not mandate written notification. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 96-97 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Defense counsel initially indicated he might seek a continuance to meet the proposed aggravating evidence, but no continuance was actually requested.

On the morning of November 27, counsel objected *in limine* to new documentary evidence on the prior convictions which the prosecutor proposed to introduce, but when the prosecutor thereupon offered to withhold the documents, defense counsel agreed there would "[b]e no problem." On appeal as below, defendant does not even hint that his preparation for trial was actually hindered by the timing of the prosecution's prior-crimes notice, and the record discloses no such prejudice. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 525-526 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Howard* (1988) 44 Cal.3d 375, 424-425 [243 Cal.Rptr. 842, 749 P.2d 279].)

Such is also the case with respect to the Murdoch evidence and photos. Though counsel received virtually no notice that Murdoch would be recalled, he sought no continuance to meet the new evidence. During discussion of the proposed testimony, counsel indicated great familiarity with what Dr. Murdoch would say, and he subsequently cross-examined Dr. Murdoch at length to emphasize that there were a substantial number of superficial wounds as well as penetrating ones. Again, defendant makes no appellate claim that he was actually hampered by the late notice.

■■■■ ■ Finally, by any applicable standard, admission of the evidence cannot have affected the penalty verdict.[25] At the guilt phase, Dr. Murdoch had already testified at length that the victim suffered more than 40 wounds over his entire body, that his thumb was nearly severed, and that several of the abdominal wounds had penetrated deeply. Photos introduced at the guilt phase had clearly depicted these wounds. (See *ante*, at p. 706.)

Thus, the additional inflammatory effect of the new penalty phase testimony and photos was minimal at best. Moreover, the prosecutor's succinct closing argument made only brief and mild references to the prior crimes, concentrating instead on the circumstances of the capital crimes. We see no basis for reversal.

---

[25] We find state-law error at the penalty phase harmless if there is no "reasonable possibility" the error affected the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-449 [250 Cal.Rptr. 604, 758 P.2d 1135].) Defendant, however, suggests that the notice required by section 190.3 is a state-defined *federal due process* right (cf. *Hicks* v. *Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 180, 100 S.Ct. 2227]), thus arguably invoking the "beyond reasonable doubt" standard of harmlessness. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) We need express no views on these issues.

## B. *Jury's understanding of sentencing responsibility.*

 Defendant claims the court committed error by instructing, in the "unadorned" language of the 1978 death penalty law, that the jury "shall" impose the death penalty if persuaded the aggravating factors "outweigh" those in mitigation. (§ 190.3; CALJIC, former No. 8.84.2 (4th ed. 1979).) We have observed that in particular circumstances this language, unless further explained, might be misunderstood to require a "mandatory" and "mechanical" penalty determination, devoid of normative discretion to decide the "appropriate" penalty under all the circumstances. (E.g., *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1278 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v. *Brown* (1985) 40 Cal.3d 512, 544, fn. 17 [220 Cal.Rptr. 637, 709 P.2d 440].) In *Brown, supra,* we therefore called for clarifying instructions in future cases. We stated we would examine the individual merits of each pre-*Brown* trial in which an unadorned "shall/outweigh" instruction was given to determine whether, under all the particular facts, a reasonable jury may have been misled. (40 Cal.3d at pp. 544, fn. 17 & 545, fn. 19.)

We see no such possibility here. In the first place, the court instructed that "any evidence of an aggravating factor" was to be disregarded unless the jury unanimously found it true beyond a reasonable doubt. On the other hand, the jury was told to consider in mitigation not only the specific factors listed, but "any other aspect of the Defendant's character or record that the Defendant offers as a basis for [a] sentence less than death."[26] These instructions implied that the penalty determination required extreme responsibility and reliability in the evaluation of aggravating factors, yet was a broad inquiry demanding sympathetic concern for all subjectively extenuating factors of defendant's life and character. (Cf. *Melton, supra,* 44 Cal.3d at p. 761.)

More importantly, the prosecutor, despite occasional forays into mechanical and mandatory language, made clear that the jury was to arrive at the "appropriate" penalty by "weighing" the aggravating and mitigating factors in light of their own consciences. Early in his argument-in-chief, the prosecutor did say the ultimate decision was "obvious" once the aggravating and mitigating factors had been "weighed."[27] Moreover, in his rebuttal, he suggested that if aggravating and mitigating circumstances were merely "counted," the former would prevail.

---

[26] The latter instruction was given in compliance with our direction in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813].

[27] After restating the "shall/outweigh" language of the instruction, the prosecutor explained, ". . . You're to *weigh* them, and if one, if the aggravating outweighs the mitigating, then, decision's obvious. Otherwise it's obvious the other [direction]." (Italics added.)

However, the prosecutor also emphasized that the law did not make it as "simple" as counting, but required a subjective "weighing" process in which the jurors themselves decided how much weight to give each factor.[28] Moreover, the prosecutor pursued the overall theme that death was the penalty defendant deserved for his crimes. The prosecutor acknowledged that the jury was entitled to show defendant sympathy and mercy, though suggesting that compassion was inappropriate in light of defendant's callousness to his victim.[29] Defendant claims the prosecutor tried to persuade the jury it had no moral responsibility for a death verdict. However, the context is otherwise; the prosecutor merely indicated the jury should resist defense efforts to equate the moral burden of a death judgment with that attending the murder itself.[30]

Defense counsel's argument reinforced the notion that the penalty determination was normative and subjective. As counsel declared, ". . . When it comes down to judging [the relevant sentencing] factors, balancing those factors, the law's quite vague in my opinion. [¶] The critical term is outweighed. Does aggravation outweigh mitigation. And I think the law fails to give you much definition at this point. I think a lot is left up to you." Counsel stressed the regard expressed for defendant by relatives and neighbors, argued there was lingering doubt of a robbery motive for the murder, and urged that a death verdict might repeat defendant's mistake of presuming the right to take life.

---

[28] The prosecutor declared, "If we count under the law, the mitigating factors and the aggravating factors [as the prosecutor had listed them], if we just count them, one, two, three, four, and add them up, the chances are you'll find that there are more aggravating factors than mitigating factors in this case. *But, the law doesn't make it that simple.* [¶] *It doesn't say what weight you give to each factor. And ultimately it's up to you.* But, if [you] simply look at those factors and add them up, mechanically, you'll probably see there are more aggravating factors against the Defendant than [there] are mitigating factors." (Italics added.)

[29] In his closing argument-in-chief, after listing his version of the pertinent aggravating and mitigating circumstances, the prosecutor said, "The main thing it seems to me to consider is what has the Defendant done? It's by his acts that a person really is known. It's by his acts that the person really is. [¶] . . . [¶] He has earned no sympathy from you. Although the law mentioned sympathy, mercy, certainly if you give him sympathy or mercy or pity, that he gave to that victim, there will be no question about your decision. [¶] Whatever you give, he has earned, he has deserved by his conduct." Returning to this theme at the conclusion of his rebuttal argument, the prosecutor declared, "If you show mercy or pity or sympathy, you certainly will not be showing that, you will be showing something that the Defendant did not show [to] anybody. [¶] Whatever your decision is, I'm sure the community will appreciate your time and effort here, whatever your decision is, will be a proper one."

The prosecutor's implication that the jury had been told it could consider sympathy and mercy is not clearly supported by the record. The court intended to give such an instruction, the clerk's transcript lists it as given, and the jury apparently had printed copies of the instructions. However, the reporter's transcript does not show that a "pro-sympathy" instruction was read to the jury in open court.

[30] At the outset of his rebuttal argument, the prosecutor observed, "Counsel seeks to place upon your conscience the burden *and equates it with what Thaddaeus did.* That's wrong. And you shouldn't allow that to happen to you." (Italics added.)

Under these circumstances, we cannot imagine a reasonable jury would believe it should merely evaluate the aggravating and mitigating factors in some mechanical way, without deciding what penalty defendant deserved under all the evidence. We see no basis for reversal.

C. *Elimination of "other violent crimes" factor from list of aggravating circumstances.*

■■■ After discussion with counsel, the trial court eliminated factor (b), "[t]he *presence or absence* of criminal activity by the defendant [other than the currently charged crimes] which [activity] involved the use or attempted use of force or violence or the express or implied threat to use force or violence" (italics added), from the list of aggravating and mitigating circumstances to be read to the jury. (§ 190.3, factor (b).) The only instructional reference to defendant's "other crimes" was that set forth in factor *(c)* of section 190.3: "[t]he presence or absence of any prior *felony conviction.*" Defendant now claims this was prejudicial error, in that it prevented the jury from realizing that his *lack* of other *violent* crimes was a *mitigating* factor.

We disagree. In the first place, any "error" was invited by defendant himself. Defense counsel submitted the instruction in the form finally given. The prosecutor opposed deletion of factor (b) on grounds that, even though the circumstances of defendant's prior robbery had not been introduced, the least adjudicated elements of the robbery necessarily implied violence. On the other hand, both the court and the prosecutor reminded defense counsel of the "presence or absence" language, pointing out that the omitted factor would *aid* defendant if in fact his background lacked violence. Still, defense counsel indicated his "preference" that factor (b) be omitted, and his position prevailed.

On this record, counsel's tactical purpose is obvious. Counsel knew that only defendant's bare reference to a prior robbery *conviction* had been allowed in evidence. Counsel sought to confine the jury's consideration of this incident accordingly, and to foreclose a prosecution argument that the robbery counted not only as a prior conviction, but also as a "violent" crime. (See *Melton, supra,* 44 Cal.3d at p. 764.) This clear tactical decision prevents a contention on appeal that any resulting error is grounds for reversal. (*People* v. *Avalos* (1984) 37 Cal.3d 216, 228-229 [207 Cal.Rptr. 549, 689 P.2d 121]; cf. *Wickersham, supra,* 32 Cal.3d at pp. 334-335.)

In any event, there was no reversible prejudice, because counsel's tactic had the desired result. The prior robbery was, in fact, a *violent* crime within the meaning of section 190.3, factor (b). Had a reference to factor (b) been

included in the instruction, the prosecutor would most likely have so argued, thus enhancing this prior conduct as an *aggravating* factor in the jurors' eyes. Deletion of instructional language based on section 190.3, factor (b), did not prevent the jury from considering past "nonviolence" as a circumstance in defendant's favor.

 D. *Prosecutor's reference to "unlisted" aggravating factors; prosecutor's argument that absence of mitigating factors was aggravating.*

Defendant urges that two instances of improper argument by the prosecutor warrant reversal of the penalty judgment. First, defendant suggests, the prosecutor urged certain circumstances as aggravating though they are not listed by section 190.3 as relevant to sentencing. (See *People* v. *Boyd* (1985) 38 Cal.3d 762, 771-776 [215 Cal.Rptr. 1, 700 P.2d 782].) Second, defendant asserts, the prosecutor argued aggravation from the mere fact that certain mitigating factors listed in the statute were absent. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [256 Cal.Rptr. 96, 768 P.2d 610].)

Defendant raised no objection to the prosecutor's comments when they were made, though prompt admonitions would have cured any prejudice. Despite plausible claims that the alleged instances of misconduct were thus waived on appeal (e.g., *People* v. *Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250]), we have previously evaluated such unchallenged prosecutorial arguments made in trials before *Boyd* and *Davenport,* were decided. (See *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1184 [259 Cal.Rptr. 701, 774 P.2d 730], and cases cited.)

 ▬ Having done so here, we see no ground for reversal. Defendant first urges impropriety in the prosecutor's assertions that defendant was incarcerated for each of his prior felony offenses, and that he committed the Savage murder within months after his most recent release. As defendant notes, neither prior "prison sentences," nor the time between release from prison and new criminal conduct, are statutorily listed aggravating factors.

However, the prosecutor did not state that defendant's self-admitted prior incarcerations were independent aggravating factors. He simply noted, as one of the "circumstances of the [current] crime" (§ 190.3, factor (a)), that the murder of Savage occurred soon after defendant's release from felony incarceration. The prosecutor may, of course, broadly argue all reasonable inferences from statutorily admissible aggravating evidence. (See *Davenport, supra,* 41 Cal.3d at p. 288; see also *Miranda, supra,* 44 Cal.3d at pp. 110-111.) The suggestion that the Savage homicide took place under "circum-

stances" indicating defendant's unwillingness to learn from prior punishment was entirely proper. (Cf. *People* v. *Balderas* (1985) 41 Cal.3d 144, 202 [222 Cal.Rptr. 184, 711 P.2d 480].)

■■■ Defendant correctly notes that the prosecutor thrice improperly referred to the absence of a mitigating factor as aggravating. According to the prosecutor, if the jury believed that Savage was not a participant in his own homicide (see § 190.3, factor (e)), that defendant had no belief in moral justification for the killing (*id.*, factor (f)), and that defendant did not kill under extreme duress or domination (*id.*, factor (g)), those were circumstances in aggravation.

Under similar circumstances, we have consistently declined to deem such improper argument a basis for reversal of a death judgment. This jury was instructed to consider a particular sentencing factor only "if applicable." Moreover, as already indicated, the jurors were not misled about their discretion and responsibility to determine the appropriate penalty under all the evidence. (*Ante,* at pp. 710-712.)

Where this is so, "we have assumed reasonable jurors would understand how to evaluate the absence of particular mitigating factors. [Fn. omitted.] . . . ." (*Hamilton, supra,* 48 Cal.3d at p. 1184.) Such jurors are unlikely to give substantial aggravating weight to the absence of obviously mitigating factors, such as victim participation or consent, belief in moral justification, or extreme duress or domination, which are rarely present in capital homicides. (Cf. *Davenport, supra,* 41 Cal.3d at p. 289.)

Moreover, the instant jury was confronted with a particularly savage murder, committed for purposes of robbery against a victim who had befriended defendant and had shown him kindness. Defendant had at least two recent prior felony convictions, one embracing violence. In mitigation, defendant showed only that he was loved and considered gentle by family and friends, and had been reliable in recent job performance. In view of the overwhelming balance of valid aggravating evidence, we see no reasonable possibility the prosecutor's mischaracterizations affected the penalty verdict. (See *Hamilton, supra,* 48 Cal.3d at pp. 1184-1185; *Brown, supra,* 46 Cal.3d at pp. 447-448.) No ground for reversal is shown.

E. *Motion to modify death verdict under section 190.4, subdivision (e).*

Defendant argues that the case must at least be remanded to the trial judge for redetermination of the automatic motion to modify the death verdict. (§ 190.4, subd. (e) (hereafter § 190.4(e).) Defendant claims that, in

denying the motion, the judge erred by relying upon nonstatutory aggravating circumstances, by ignoring mitigating evidence, and by failing to exercise his independent judgment whether death was the appropriate punishment. Our examination of the judge's decision on the motion shows no necessity for a remand.

Section 190.4(e) creates an automatic motion for modification of any death verdict returned by the trier of fact. When ruling on the motion, the trial judge "shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

The trial judge here commenced his ruling by quoting his duties from the statute, and by reciting the aggravating and mitigating factors set forth in section 190.3 which he was obligated to consider. Next, the judge discussed the basic facts of the homicide. The judge suggested the jury had obviously rejected defendant's claim of sudden panic and rage, accepting instead "a great deal of evidence" that defendant planned in advance to harm the victim, perhaps in part because of dislike for homosexuals. Given the other evidence of premeditation, said the judge, the number and force of the stab wounds supported an inference that defendant "made sure of the attainment of his objective of putting down a man like Mr. Savage."

Next, as defendant suggests, the judge began to evaluate the circumstances of the homicide in terms apparently (though not explicitly) derived from the aggravating and mitigating factors set forth in the California Rules of Court, division III, Sentencing Rules for the Superior Courts (hereafter Sentencing Rules). The judge noted defendant's use of a weapon (see Sentencing Rule 421(a)(2)) and indicated that the victim might be considered "vulnerable" to the extent he was unarmed and unaware of defendant's intent (see Sentencing Rule 421(a)(3)). On the other hand, the judge observed, there was only one victim and one killer; this case did not involve defendant's "leadership" of a criminal enterprise. (See Sentencing Rules 421(a)(4) [multiple victims as aggravating], 421(a)(5) [defendant's "leadership or dominance of other participants" as aggravating].) The judge found evidence of "planning in the sense of the cut telephone wires" (see Sentencing Rule 421(a)(8) [planning, sophistication, or professionalism indicating premeditation as aggravating]), and observed that defendant used a position of trust to steal substantial property (see Sentencing rules 421(a)(12) [advantage from position of trust as aggravating], 421(a)(10) [great value of property taken as aggravating]).

The judge pointed to defendant's prior "prison" record (see Sentencing Rules 421(b)(3) [prior prison record as aggravating], 423(b)(1) [absence of significant prior criminal record as mitigating]), including the recency of his release prior to the homicide. Given the jury's obvious acceptance of the prosecution's robbery-murder theory, said the judge, "the defendant didn't play a passive or minor role in this matter" (see Sentencing Rule 423(a)(1) [passive or minor participation as mitigating]). Finally, the judge remarked, no "mistake" was involved (see Sentencing Rule 423(a)(7) [mistaken belief in right as mitigating]), and defendant had not voluntarily admitted wrongdoing (see Sentencing Rule 423(b)(3) [defendant's early voluntary acknowledgment of wrongdoing as mitigating]).

Thus, the judge summarized, there was "every reason to believe" that defendant committed first degree murder in the commission of robbery, and that the aggravating circumstances outweighed those in mitigation. The judge saw no indication of a penalty jury inflamed by passion. He acknowledged defendant's status as a human being, but observed that the victim also had humanity. The judge then ruled that the motion for modification of the jury's choice of penalty for the offense should be denied.

■ Defendant first urges that the judge's obvious reference to the Sentencing Rules constituted improper consideration of "nonstatutory" aggravating factors. (See *Boyd, supra,* 38 Cal.3d at pp. 771-779.) For several reasons, we disagree.

The judge indicated at the outset his understanding that section 190.3 contains the pertinent sentencing factors. Moreover, even if derived from the Sentencing Rules, some of the factors mentioned by the judge were hardly more than rephrasings of those set forth in section 190.3. (See, e.g., § 190.3, factors (c) [presence or absence of prior felony convictions], (j) [defendant's status as mere accomplice or minor participant].)

In any event, defendant's argument is more fundamentally flawed. In *Boyd, supra,* we held only that the prosecution may not introduce penalty *evidence* unless it bears upon one of the aggravating factors listed in section 190.3. (38 Cal.3d at pp. 771-774.) We subsequently made clear, however, that counsel may broadly argue, and the sentencer may presumably weigh, all reasonably pertinent inferences from the evidence validly introduced under any factor. (*Davenport, supra,* 41 Cal.3d at p. 288; see also *Miranda, supra,* 44 Cal.3d at pp. 110-111.)

Section 190.3, factor (a) permits the sentencer to consider, in aggravation or mitigation, the *"circumstances of the [capital] crime . . .* and the existence of any special circumstances found . . . true." (Italics added.) While

factors (d) through (k) of section 190.3 set forth those aspects of the capital offense which the *law* deems specifically pertinent to the penalty determination, these paragraphs do not limit the sentencer's power, under factor (a), to weigh any other constitutionally permissible aspect of the offense which the *sentencer* deems pertinent to the appropriate penalty. Though he did not confine himself to the language of section 190.3, factors (d) through (k), the judge offered pertinent reasons why, in his independent judgment, the aggravating circumstances outweighed the mitigating, and the death verdict was not contrary to the law or the evidence.

Defendant urges that the factors derived from the Sentencing Rules, which were designed for noncapital cases, have little logical relevance to the life-death determination. He suggests that such factors as planning, use of a weapon, major participation, significant property loss, lack of voluntary remorse, and the like, are virtually assumed in cases where the most lenient possible penalty is life imprisonment without parole. (Cf. *Davenport, supra,* 41 Cal.3d at p. 289.) We cannot accept this untested assumption. Indeed, in our experience, counsel typically argue that factors such as these, where suggested by the evidence, are pertinent to the capital penalty determination.

The judge in this case simply evaluated the "circumstances" of defendant's capital crime, all of which were validly in evidence, under a normative framework familiar to him from another context, but relevant as well to capital sentencing. In so doing, he committed no error.[31]

 Defendant claims the judge ignored constitutionally relevant mitigating evidence of defendant's character and background unrelated to the capital offense. The argument stems from the judge's failure to mention such evidence in detail on the record. However, the judge had previously instructed the jury to weigh such evidence and, at the beginning of his ruling on the section 190.4(e) motion, he expressly declared his own obligation to consider it. He never stated or implied that he deemed such evidence legally irrelevant. He acknowledged defendant's "status as a human being," but indicated he simply found the factors in aggravation preponderant. (See, e.g., *People* v. *Rich* (1988) 45 Cal.3d 1036, 1123 [248 Cal.Rptr. 510, 755 P.2d 960].) We see no evidence of impropriety.

---

[31] Defendant does not claim, and our review of the judge's remarks does not suggest, that the judge found aggravation from the mere absence of elements which, under section 190.3, could only be considered mitigating in a capital case. (See *Davenport, supra,* 41 Cal.3d 247.)

Defendant does urge that the judge erroneously considered defendant's prior "prison term," a factor both unrelated to the capital crime and unlisted in section 190.3. However, as we have previously explained, defendant's recent release from prison is a "circumstance" of the capital crime which is logically relevant to penalty, since it suggests that defendant was unswayed from criminal conduct by his recent incarceration.

■ Finally, defendant urges the judge failed to exercise his "independent judgment" about the appropriate penalty. Assuming the trial judge has such a duty under section 190.4(e), defendant points to no indication that the duty was breached. When the judge's comments are read as a whole, they reveal his personal belief that defendant committed a premeditated robbery-murder against a trusting victim, that aggravation outweighed mitigation, and that the jury's verdict of death was appropriate under all the circumstances.[32]

F. *Proportionality review.*

■ Defendant urges us to adopt a system of comparative, or intercase, proportionality review. He presents an elaborate survey of published Court of Appeal decisions to demonstrate the hypothesis that many first degree murderers of equal or greater culpability have received sentences less than death.

Comparative proportionality review is not constitutionally required, and we have consistently declined to undertake it. (E.g., *People* v. *Sheldon* (1989) 48 Cal.3d 935, 960 [258 Cal.Rptr. 242, 771 P.2d 1330]; *Jennings, supra,* 46 Cal.3d at p. 995.) However, the Eighth Amendment of the United States Constitution and article I, section 17 of the California Constitution preclude the imposition of punishment that is not proportionate to the defendant's individual culpability. (*People* v. *Karis* (1988) 46 Cal.3d 612, 649 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-484 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921].)

Defendant, while a guest in the victim's home, committed a savage, sustained, and murderous knife assault upon his unarmed host. As we have discussed, the evidence strongly suggests that defendant planned in advance to rob and personally kill the victim, relying on feigned friendship to win the victim's trust and gain access to his property. Given defendant's calculated brutality in aid of an independent felonious purpose, we cannot conclude that the death penalty is disproportionate to defendant's individual culpability.

---

[32] After discussing the evidence in detail, the court observed that "there is *every reason to believe* . . . that the Defendant committed the murder of—there was murder in the first degree, that it was committed in the commission or attempted commission of robbery, and furthermore that the aggravating factors outweigh the mitigating factors. [¶] . . . [¶] I recognize Mr. Turner as being a human being. Roy Savage was a human being. Mr. Savage is dead. And he died at the hands of Mr. Turner. And the jury decided that it was the death penalty that should be imposed on Mr. Turner for the offense. [¶] And *the Court believes under all the facts and circumstances of this case* that the application for modification of that verdict should be and it is denied." (Italics added.)

DISPOSITION

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., and Kaufman, J.,* concurred.

**BROUSSARD, J.**—I dissent. The majority recognize that the trial court erred in failing to instruct on the lesser included offense of theft and in failing to provide theft verdict forms. The errors are of constitutional dimension, depriving a defendant of the fundamental fairness demanded by due process.

The majority fail to recognize the extent of prejudice flowing from the errors. Defendant told a plausible story that the fight was triggered by decedent's attack and that he decided to steal after the death. The prosecution theory is hard to believe in light of the undisputed circumstantial evidence: it is difficult to believe, when defendant set out from Fresno to Merced and brought along only a knife that he intended to rob. It is equally difficult to believe that after spending time with decedent and his friends and acquaintances, defendant decided to rob. The choice of weapon is uncommon for robbery and people seldom rob when they may be so easily identified and located.

In a case such as this, where the defendant takes the stand and confesses to theft, the effect of the errors is to deny the defendant any instruction on his defense. Instead, the jurors were placed in the position that, if they were to credit defendant's testimony, they would have to acquit defendant even though they heard him confess to felonies from the witness stand. In these circumstances, it is likely that the jurors, rather than give defendant the benefit of the reasonable-doubt instruction that is fundamental to our criminal law, would lean over backward to find defendant guilty of robbery in order to avoid acquitting a confessed felon. The unfairness is manifest.

The majority argue that the errors were not prejudicial because the factual question posed by the omitted instruction was necessarily resolved against defendant under other, proper instructions. However, those instructions were applicable on the basis of a finding of robbery, which is the result of the error, and the jury once having made the factual determination that the intent to steal preceded the fight could not be expected to fairly reconsider the same factual issue. The later instructions did not eliminate the

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairperson of the Judicial Council.

prejudice flowing from the errors. The asserted factual finding flowing from those instructions in effect flows directly from the errors.

## I. THE ERRORS

The right to instructions on lesser included offenses is an aspect of the fundamental fairness demanded by due process, and such instructions are required in capital cases by the federal Constitution. (*Beck* v. *Alabama* (1980) 447 U.S. 625, 627 et seq. [65 L.Ed.2d 392, 396, 100 S.Ct. 2382].) The right in noncapital cases is an incident to due process guaranteed by our state Constitution. Absence of lesser-included-offense instructions diminishes the reliability of the determination. (*People* v. *Geiger* (1984) 35 Cal.3d 510, 518-520 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055].)

Theft is a lesser included offense to robbery, which includes the additional element of force or fear. (*People* v. *Melton* (1988) 44 Cal.3d 713, 746 [244 Cal.Rptr. 867, 750 P.2d 741]; *People* v. *Covington* (1934) 1 Cal.2d 316, 320-321 [34 P.2d 1019].) The court must instruct on a lesser included offense on its own motion " 'when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense.' " (*People* v. *Melton, supra,* 44 Cal.3d 713, 746.) Had a properly instructed jury convicted defendant of theft, the evidence would be sufficient to uphold the conviction.

*People* v. *Ramkeesoon* (1985) 39 Cal.3d 346 [216 Cal.Rptr. 455, 702 P.2d 613] presented an analogous record, in that defendant was charged with robbery and murder, and the court failed to instruct on theft where the defendant testified that his intent to steal arose after the killing. There, defendant's convictions of first degree murder and robbery were reversed on the ground that the trial court erred in refusing to instruct on larceny and theft as a lesser included offense of robbery.

The court in its unanimous opinion stated: "It cannot be seriously disputed that the court erred. . . . It is well settled that the trial court is obligated to instruct on necessarily included offenses—even without a request—when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 325 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

"The necessity for instructions on lesser included offenses is based in the defendant's constitutional right to have the jury determine every material issue presented by the evidence. (*People* v. *Geiger* (1984) 35 Cal.3d 510, 519

[199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]; *People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33].) As the United States Supreme Court explained in *Keeble* v. *United States* (1973) 412 U.S. 205, 212 [36 L.Ed.2d 844, 850, 93 S.Ct. 1993]: '[I]t is no answer to petitioner's demand for a jury instruction on a lesser included offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction.' (See also *People* v. *St. Martin* (1970) 1 Cal.3d 524, 533 [83 Cal.Rptr. 166, 463 P.2d 390].)

"Clearly the evidence in this case warranted an instruction on theft as a lesser included offense. Defendant testified that he had not thought about stealing any of Mullins' property until after the assault was completed. If defendant had not harbored a larcenous intent before or during the assault, the taking was theft rather than robbery. (*People* v. *Green* (1980) 27 Cal.3d 1, 54 [164 Cal.Rptr. 1, 609 P.2d 468].) Although the jury was not required to believe defendant's testimony, it was credible enough to have supported a verdict of theft instead of robbery. (See *People* v. *Wickersham, supra,* 32 Cal.3d at p. 325.)" (*People* v. *Ramkeesoon, supra,* 39 Cal.3d 346, 351, italics in original.)

Defendant in the instant case, as in *Ramkeesoon,* testified that he had not thought about stealing any property until after the fight was completed. If he did not harbor larcenous intent before or during the fight, the taking was theft instead of robbery. He confessed from the witness stand to taking the television set and stealing the car. The fact that he said he panicked would not preclude a finding of theft. Defendant's testimony and the similar statements related by the psychiatrist were sufficiently credible to have supported a verdict of theft instead of robbery.

I conclude, as the majority do, that the trial court erred in failing to instruct on the lesser included offense of theft.

## II. THE PREJUDICE

As in *Ramkeesoon* (*supra,* 39 Cal.3d at pp. 351-353), the error is prejudicial in the circumstances of this case. Defendant's testimony that the fight

erupted when decedent attempted to attack him sexually was plausible under the other evidence in the case.

The crucial factual issue presented by the case, since defendant admitted killing and stealing, was the time defendant formed the intent to steal.[1] Defendant testified that decedent attempted to rape him, that he responded using his buck knife to stab decedent, that they fought as he continued to cut and stab decedent, and that it was only after he found decedent dead that he decided to steal anything. There was circumstantial evidence that supported defendant's testimony. Thus, there was circumstantial evidence that in hiring defendant, who had a full-time job and lived in another city, to do gardening work, decedent may have had an ulterior sexual motive. I do not understand the majority to argue otherwise. (See maj. opn., *ante*, at p. 689.) There was also the evidence that decedent ejaculated. The prosecution presented expert testimony that ejaculation has been known to occur immediately prior to death, apparently when no sexual activity was involved. This evidence precluded the ejaculation evidence from being conclusive on the sexual-conduct issue but did not mean that the ejaculation evidence was not entitled to substantial weight in evaluating defendant's claim that decedent attacked him.

The majority fail to mention that decedent was six feet three inches tall and suffered from a weight problem. The evidence is important to the defense because it suggests that decedent probably would have been able to subdue defendant in a physical attack in the absence of any weapon. (But cf. maj. opn., *ante,* at p. 689.)

The omitted fact takes on much more importance when it is considered in the light of the prosecution's version of the facts. Both the prosecution and the defense evidence established that decedent knew defendant and knew where to find him. The prosecution theory was that defendant determined to rob decedent and determined to kill him so that he could steal decedent's possessions. Defendant's weapon was a knife, which requires close combat. It is difficult to believe that defendant formed the intent to rob and kill before he left Fresno for Merced in view of his weapon and the size of decedent. After defendant was introduced to and spoke at length with decedent's friends and acquaintances, there is little likelihood that he

---

[1] It is apparent that the jury focused directly on the issue from the outset. A little more than an hour after retiring for deliberations, the jury asked for part of the record to be read: the testimony of defendant and the defense psychiatrist. The court suggested that the request was too broad and suggested that perhaps it could be limited to a specific point. In response to the jurors' further request, the reporter read the portion of the psychologist's testimony of defendant's statements relating to when the thought flashed through his mind whether to steal.

formed the intent to rob when he could be easily identified by decedent's friends and acquaintances. Further, it must be obvious to even the stupidest of criminals that the knife attack had to be successful on the first stab because if there was a protracted battle decedent's large stature and weight might prove determinative. Yet there was no evidence of the deep knife wound which would be expected if defendant had initiated the violent confrontation.

The majority characterize as implausible defendant's testimony that he only stole the television set from the house and did not steal the other personal property missing from the house. (See maj. opn., *ante*, at pp. 689-690.) There was some corroborative evidence that there was a second theft. Decedent's head was found resting on a pillow. Despite all of the blood on decedent, in the area and on defendant, there was no blood on the pillow, suggesting that it had been placed there after the blood had dried but before the body was discovered. In addition, although police officers searched for the missing personal property, including searching defendant's home, they were unable to find any of it, apart from the television and the automobile. Finally, after the locks were changed on decedent's house following the killing, a broken key was found in the new front door lock, suggesting that some unidentified person had access to decedent's home.

While the above evidence indicating that there may have been a second theft may not be strongly persuasive, the evidence pointed to by the majority as indicating that the intent to steal was formed before the killing is, at least, equally weak. Moreover, the evidence relied upon by the majority could also be viewed consistently with defendant's claim that he formed the intent to steal after decedent was dead, and that the evidence does not show that defendant decided to rob and kill when he could be so easily identified and located.

Based on the evidence before the jury, an error in the instructions tilting the jury in favor of finding that defendant formed his intent to steal before the killing has to be prejudicial. The evidence that defendant formed the intent to steal before the fight is not overwhelming; it is not compelling or even very persuasive. On the record before us, the conclusion that he killed in order to steal is barely plausible. It is likely that a properly instructed jury would have found theft rather than robbery.

The majority argue that the errors were not prejudicial because the jury resolved the issue of the time the intent to rob occurred under other, proper instructions. However, the jury findings under those instructions were the product of the errors and may not properly be relied upon to eliminate the prejudice resulting from the errors.

In *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], it was pointed out that "in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only a lesser offense has been committed has been rejected by the jury." The *Sedeno* rule has been applied in other cases of failure to instruct on a lesser included offense. (*People* v. *Melton, supra,* 44 Cal.3d 713, 746; *People* v. *Ramkeesoon, supra,* 39 Cal.3d 346, 351-353; see also *People* v. *Bean* (1988) 46 Cal.3d 919, 951 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 92 [241 Cal.Rptr. 594, 744 P.2d 1127].)

In *Sedeno, supra,* 10 Cal.3d 703, there was error in the failure to instruct on involuntary manslaughter based on the defendant's diminished capacity defense, but it was concluded that the failure to instruct was not prejudicial to the issue of intent to kill because the jury, when it concluded that the offense was first degree murder rather than second degree, necessarily rejected defendant's evidence that diminished capacity negated intent to kill. Under that determination, the offense could not have been less than voluntary manslaughter.

In *Melton,* the defendant argued that properly instructed the jury might have found that the intent to steal arose after the assault making the crime theft rather than robbery. The error in failing to instruct was found nonprejudicial because the jury had found burglary under instructions that the entry to the victim's residence must have been for the purpose of theft or robbery and the entry to the residence occurred prior to the assault. Thus, the jury had determined that the intent to steal arose prior to the assault. (44 Cal.3d at p. 746.)

However, when the subsequent instructions are merely repetitive of the incomplete instructions, it cannot be said that the jury has necessarily resolved the issue in another context under proper instructions. Our unanimous decision in *People* v. *Ramkeesoon, supra,* 39 Cal.3d 346, 352, is squarely on point. There, defendant testified that he had been invited to decedent's home, that he refused an invitation to go to bed with the victim, that the victim attacked him, that a struggle ensued during which he stabbed the victim several times, and that only after he took a shower to wash the blood away did it occur to him to steal. Theft instructions were

erroneously omitted and robbery and felony-murder instructions were given.

The fact that the jury found not only robbery but also robbery-murder did not eliminate the prejudice flowing from the error. The unanimous opinion pointed out that the "omission of the theft instructions practically guaranteed robbery and felony-murder convictions since defendant had admitted taking [decedent's] property and robbery was the only available theft offense." Similarly, in *People* v. *Morales* (1975) 49 Cal.App.3d 134, 139-141 [122 Cal.Rptr. 157], it was held that a verdict of robbery and of felony murder did not necessarily resolve the question that would have been properly presented by instructions on grand theft from the person, whether the force used in snatching the victim's purse was sufficient for robbery.

In the instant case, we cannot say that the jury determined in another context that the intent to steal arose before the assault. The majority first rely upon the detailed robbery instructions as showing that the theft issue was necessarily determined by the jury. Those instructions made it clear that the jury must find that defendant intended to steal prior to the use of force. However, the prejudice involved in a failure to instruct on the lesser offense is not based on a failure of the jurors to find the elements of the greater offense, as in the instant case, that the intent to steal arose before the fight. The jurors in such cases obviously found the elements of the greater offense. The prejudice lies in the danger that the jurors, to avoid acquittal of a confessed felon, leaned over backward to find the elements of the greater offense.

When there is an error in failing to instruct on a lesser included offense, the prejudice is not eliminated by proper instructions on the elements of the greater offense. For example, in *People* v. *Wickersham* (1982) 32 Cal.3d 307, 335-336 [185 Cal.Rptr. 436, 650 P.2d 311], the jury convicted the defendant of first degree premeditated and deliberate murder after the trial court erroneously omitted instructions on the lesser included offense of second degree murder. It was held that " 'the factual question posed by the omitted instruction'—whether appellant had acted with malice and intent, but without premeditation and deliberation—was not 'necessarily resolved adversely to the defendant under other, properly given instructions.' (*Sedeno, supra,* 10 Cal.3d at p. 721.)"

The jury's determination based on the elements of the greater offense is not a determination in another context as occurred in *Sedeno, supra,* 10 Cal.3d 703, and *Melton, supra,* 44 Cal.3d 713. Use of the instructions on the elements of the greater offense to eliminate prejudice resulting from erroneous omission to instruct on the lesser would mean that the error was never

prejudicial unless there was also error in the instructions on the elements of the greater. Detailed instructions on the elements of the greater offense do not eliminate or minimize the all-or-nothing choice given to the jury by the failure to instruct on the lesser.

The felony-murder instruction and the special circumstance instruction next relied upon by the majority both were tied to the issue of robbery rather than some other offense or theft. The factual issue as to when the intent to steal occurred was the same under the robbery, the felony-murder, and the special circumstance instructions, and the jury, having determined that the intent to steal arose before the fight under fundamentally unfair instructions, could not thereafter consistently have found that the intent to steal occurred later or that there was no felony murder or special circumstance.

In both *Sedeno* and *Melton,* the tainted finding did not compel the findings relied upon to eliminate prejudice. Thus, in *Sedeno* the failure to instruct on involuntary manslaughter tainted the finding of intentional homicide, but it did not compel the jury findings of premeditation and deliberation. The jury could, consistent with the tainted finding, find second degree murder, and since the jury was free to reject premeditation and deliberation it was appropriate to rely upon the findings of premeditation and deliberation to show that the error in failing to instruct on involuntary manslaughter was not prejudicial.

In *Melton* the tainted determination of robbery that the intent to steal arose before the homicide did not require a determination that the intent to steal arose prior to entry of the house. Because consistent with the tainted finding the jury could reject burglary, the finding of burglary was not the product of the error, and it was proper to rely upon the finding to show that the tainted finding was not prejudicial.

It is simply not logical to use the products of the error to dispel the prejudice arising from the error, as the majority does. Moreover, the majority offer no valid basis to distinguish the unanimous decision in *Ramkeesoon.* It is improper to speculate that the instructions in that case on robbery and felony murder failed to set forth the elements of the offenses. If the instructions were incomplete the court in reversing the convictions obviously would have mentioned the fact.

The prejudice flowing from a failure to instruct on a lesser included offense, as we have seen, is that the jury, given the choice between conviction of the greater offense and outright acquittal, when the evidence obviously establishes some offense, is likely to resolve its doubts in favor of

conviction in violation of our most fundamental rule of criminal law. In the instant case, the jury was never given an option to find that defendant's offense was theft rather than robbery and that therefore there was no felony murder or special circumstance. Repetitious instructions on the elements of the greater offense do not eliminate the prejudice. The manifest unfairness of the original instruction as to the time the intent to steal occurred carried over to the subsequent instructions.

Accordingly, the failure to instruct on theft was prejudicial.

The judgment should be reversed.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied June 21, 1990.