Filed 12/7/20  P. v. Valcarenghi CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C087742 |
| Plaintiff and Respondent, | (Super. Ct. Nos. 17CF03476, 16CF00552) |
| v. | |
| MARC ANDRE VALCARENGHI, | |
| Defendant and Appellant. | |

A jury found defendant Marc Andre Valcarenghi guilty of first degree murder and the trial court sentenced him accordingly.  On appeal, defendant argues there was insufficient evidence of premeditation and deliberation to support a verdict of first degree murder.  Disagreeing, we affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In July 2017 defendant was staying at a hotel in Chico, California that was frequented by the area's homeless population. A few days into his stay, he accepted a prostitute as a roommate, permitting his hotel room to be used for the provision of sexual services in exchange for money and/or drugs. When the prostitute had customers, defendant left the room. The prostitute introduced defendant to the victim, Audra Houston, a homeless woman who struggled with drug addiction.

The evening before Houston's death, a small group of people, including defendant and Houston, congregated in defendant's hotel room, listening to music and smoking methamphetamine together. During the gathering, defendant made a romantic advance toward Houston, who initially reciprocated but ultimately rejected it.

The next evening, while defendant's roommate was with a customer, Houston and defendant socialized in Houston's hotel room. Houston fell asleep at some point, and while she slept, defendant sold methamphetamine to a female inside the bathroom of the hotel room.

The female drug buyer testified that when she entered the hotel room, Houston was snoring on the bed, and that after the transaction in the bathroom, the buyer rejected defendant's sexual advances and walked by Houston, who was still laying on the bed, then left the room.

According to the buyer, the hotel room "looked like . . . a regular room from . . . a female that would be rushing around trying to get ready for something and being [i]ndecisive about what to wear." In the bathroom, the shower curtain was on the floor of the shower and no rod for the curtain was visible.

A male who rented the room next to Houston's entered his room around 1:27 a.m., drank wine until becoming "a little tipsy," eventually went to sleep, and woke up at 11:00 a.m., having "slept peacefully" all night.

2

Surveillance video footage indicated that defendant left Houston's room around 1:30 a.m. and returned around 2:00 a.m. Around 2:30 a.m., defendant left the room for a few moments, then entered again and remained there until around 8:30 a.m.

Hours later, Houston's bruised corpse was found lying face-down under the bed of the hotel room with many cut pieces of clothing tied around her neck and arm, her eyes swollen shut, and blood on her face.

A few days later, Chico police arrested defendant when they found him sleeping in bushes less than a mile from the hotel. He was charged with first degree murder and ultimately proceeded to trial.

*People's case*

The People's expert witness testified that Houston's many injuries were inflicted during a single period of time lasting at least one hour and possibly up to several hours. With photographs of Houston's corpse submitted as evidence, the expert explained that Houston's injuries included numerous "sharp force" trauma punctures on her back and neck, blunt force trauma to her face and spleen, and manual and ligature strangulation wounds to her neck. The expert opined that Houston was still alive (but barely) when she was put under the hotel room bed. The cause of death was asphyxiation "over a period of minutes, which was due to homicidal strangulation which also occurred over a period of minutes."

*Defendant's case*

Defendant testified in his own defense. He claimed that immediately after he sold drugs to the female buyer in Houston's hotel room, Houston woke up and gave him permission to return later that evening. Houston told him that because she did not have a key to the room, she would leave the window cracked open so that defendant could re-enter the room. He returned to Houston's room in the early morning of the next day, through the window.

3

Defendant laid down on the bed next to a sleeping Houston, but was unable to fall asleep and decided to smoke methamphetamine and wake Houston, who smoked with him. He told Houston that he worried that he was "boring sexually" for his girlfriend, and wished he could be exciting. Houston suggested "making things a little rough" and offered to demonstrate.

Defendant agreed to be tied up by Houston; she tied pieces of her clothing together into a makeshift rope and bound defendant to the bed on his back with all four limbs restrained. They engaged in sexual activity until defendant grew uncomfortable and told Houston so. They then smoked more methamphetamine and talked. He told Houston he occasionally wore women's clothing, and he put on her bra, underwear, and heels. He then helped Houston inject methamphetamine into her neck.

Houston told defendant it was "her turn" to be restrained so that she could "erotic asphyxiat[e]." She tied more clothes together, and defendant helped her attach one end of the makeshift rope to a clothes hanger and "anchor" it between the bed and the frame. They tied the other end of the makeshift rope around Houston's neck in "multiple layers." Defendant, still wearing Houston's clothing, watched and masturbated himself while Houston, using a vibrator on herself and "talking dirty" to defendant, moved around to tighten the pressure on her neck.

In addition to the makeshift rope anchored under the bed, a second rope made of clothing ran from Houston's left arm to her neck, and was tied on both ends. Houston also used that makeshift rope to increase the tension around her neck.

Suddenly, Houston went quiet and her face "just went kind of blank." She fell face first from the edge of the bed onto the floor, and began "having convulsions, or a seizure." For about five to 10 minutes, her "whole body was bouncing . . . off the floor." Thinking that Houston was experiencing a drug overdose, defendant took her into the bathroom (with the makeshift ropes still tied to her), hoping cold water would "revive" her. When cold water did not help, and Houston was not breathing, he panicked and "put

4

her under the bed." He testified that he was embarrassed that he was wearing female clothes, and that he was scared and high. He did not call 911 because there was no phone in the room, and he "thought it was too late at that point." He didn't tell the hotel manager because he "knew it looked bad."

Sometime later that morning, the hotel manager confronted defendant and told him to leave; he testified that he "didn't even get a chance to . . . try to tell [the manager] what happened." He took the vibrator, put Houston's pants back on her, and left the room with a trash can that contained evidence of drug use. He cried himself to sleep in some bushes and slept for several days. He explained that he did not tell the police what happened because he was scared and "knew it would be hard to explain that [he] was wearing women's clothes, and that [Houston] fell off the bed and went into convulsions." He admitted that he lied to the detective when he said that he did not remember what happened in the hotel room, claiming he had not wanted to discuss it.

Defendant's expert witness disagreed with some of the medical conclusions presented by the People's expert, including that there was evidence of manual strangulation. Defendant's expert concluded that the cause of Houston's death was ligature strangulation in association with methamphetamine use, and testified that the bruising to Houston's face was consistent with both falling to the ground multiple times and with being beaten. In response to the prosecutor's question whether the ligature that caused the bruising on Houston's neck "could have been tightened around [Houston's] neck in a self-inflicted manner," the expert answered: "From looking at the whole scene, I do not think so."

*Closing arguments*

The prosecutor argued that the "different ways . . . defendant took to kill . . . Houston"--the "beating," manual strangulation, ligature strangulation (which caused "very, very deep wounds," and stabbing--"takes time," and "shows that [defendant] intended to kill" Houston. "Every time [defendant] switched from a different mode of

5

attack was an opportunity for him to think about his actions and what he was doing," and "every time he chose to keep going. He chose to inflict those injuries. He chose to kill her." The "multiple different attacks" showed deliberation and premeditation.

Defense counsel conceded that "a homicide occurred," and that the People's case was "reasonable based on the facts," but insisted that if there were reasonable interpretations of the evidence other than first degree murder, a not guilty verdict was warranted. He told the jury: "The evidence falls squarely on involuntary manslaughter. . . . No way [defendant] can be high, caught up in the moment masturbating, the pros and cons of something, is this a good idea? No. That wasn't subjectively going through his mind."

In rebuttal, the prosecutor argued that defendant's version of events was not credible, including his excuse to stay silent based on his claimed embarrassment regarding his cross-dressing. They added that the evidence showed the injuries were sustained during a lengthy and brutal attack.

*Verdict & Sentencing*

The jury found defendant guilty of first degree murder. The trial court sentenced defendant to state prison for a term of 25 years to life, consecutive to a determinate term of three years eight months for an unrelated earlier case. Defendant timely appealed.

DISCUSSION

Defendant's sole claim on appeal is that there is insufficient evidence of premeditation and deliberation to sustain his conviction for first degree murder.

It is well settled that: " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Battle* (2011) 198 Cal.App.4th 50, 61-62.) The parties agree that the framework of *People v. Anderson*

6

(1968) 70 Cal.2d 15, is relevant in assessing the sufficiency of the evidence of premeditation and deliberation.

"*Anderson* identified three factors commonly present in cases of premeditated murder: '(1) [F]acts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing--what may be characterized as "planning" activity; (2) facts about the defendant' s prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" [citation]; (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.)

However, "[t]he *Anderson* factors are not the exclusive means for establishing premeditation and deliberation. [Citation.] [Our Supreme Court has] . . . concluded that an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive. [Citation.]" (*People v. Lenart* (2004) 32 Cal.4th 1107, 1127; see *People v. Turner* (1990) 50 Cal.3d 668, 688-689, fn. 4 [brutality *alone* "can be indicative of calculated violence *in context*, particularly where . . . the brutality itself contradicts defendant's version of events, and other evidence also supports a theory of premeditation"].)

The People presented ample evidence that, if believed, established a brutal killing that took time and effort to accomplish. There was evidence that defendant harmed Houston in multiple ways, all of them brutal beyond a degree of harm that would have simply ended her life. The evidence showed strangulation as well as multiple instances of both sharp force and blunt force trauma, inflicted over a substantial period of time. Each time defendant employed a different mode of violence, he evinced a new commitment to his homicidal objective. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1127-1128 ["Some period of time necessarily must have elapsed between the first and second set of wounds. While this conduct, in itself, may not necessarily support a finding of premeditation, in conjunction with the manner of killing, it could easily have led the jury to infer premeditation and deliberation"].)

Further, the evidence of the type, severity, and number of wounds on Houston's body contradicted defendant's assertions that the trauma to Houston's neck was self-inflicted and that the bruises on her face and body resulted from a fall off the bed and convulsions on the floor, all within a five to 10 minute time period. (See *People v. Turner, supra*, 50 Cal.3d at pp. 688-689, fn. 4.) The evidence provided by the People's expert regarding the amount of time it took to inflict all of Houston's injuries (at least one hour, probably more) and to strangle her to death (several minutes) also supports a finding of premeditation. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1019-1020 [evidence that the victim "was strangled with a rope and that her death from asphyxiation would have taken between five and eight minutes" permitted a rational factfinder to infer that the manner of killing demonstrated deliberation, as such a "prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act"]; *People v. Davis* (1995) 10 Cal.4th 463, 510 [sufficient evidence of premeditation and deliberation for first degree murder where, among other facts, defendant strangled the victim for "over a period of up to five minutes" (italics omitted)].)

8

Defendant maintains that the key time frame surrounding Houston's death was between 1:00 a.m. and 2:31 a.m., and that the testimony of the female drug buyer and the occupant of the adjacent room indicate that Houston "already was in the process of setting up the autoerotic mechanism" when the buyer entered because, defendant maintains, the room was not neat; further, there was no audible struggle to awaken the occupant of the adjacent room. This argument fails to persuade.

First, defendant's restricted time frame ignores that moments after he left Houston's room around 2:30 a.m., he *reentered* it, and did not leave again until about 8:30 a.m. Second, defendant's contention that the drug buyer's testimony of the state of Houston's room indicated that Houston was already involved in autoeroticism is purely speculative, relying on an imaginative reading of testimony that the room looked like a someone had been "rushing around" and indecisive "about what to wear," and that there was no shower curtain rod in place. The contention also ignores defendant's own testimony that Houston first proposed the autoeroticism *after* defendant returned to the room around 2:00 a.m., which was *after* the drug buyer made her observations.

Finally, the contention that there was no struggle between Houston and defendant because the sleeping occupant of the adjacent room (who by his own admission had been drinking wine and grew "tipsy" before falling asleep) heard nothing that night, without more, is pure speculation, and certainly does not compel reversal. (Cf. *People v. Valdez* (2004) 32 Cal.4th 73, 118 ["the trial court did not err in refusing to instruct the jury on second degree murder because the defendant's argument rested on mere speculation"].)

Accordingly, we conclude there was substantial evidence from which a reasonable jury could have found defendant guilty of first degree murder beyond a reasonable doubt.

DISPOSITION

The judgment is affirmed.

_____/s/_____
Duarte, Acting P. J.

We concur:

_____/s/_____
Hoch, J.

_____/s/_____
Krause, J.

10